# EVANS, GOVERNOR OF IDAHO, ET AL. *v.* JEFF D.
## ET AL., MINORS, BY AND THROUGH THEIR NEXT
## FRIEND, JOHNSON, ET AL.

No. 84–1288.   Argued November 13, 1985—Decided April 21, 1986

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACK-MUN, JJ., joined, *post*, p. 743.

*James Thomas Jones,* Attorney General of Idaho, argued the cause for petitioners. With him on the briefs were *John J. McMahon,* Chief Deputy Attorney General, and *Michael De Angelo* and *James Wickham,* Deputy Attorneys General.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Fried, Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, Kathryn A. Oberly, John F. Cordes,* and *Douglas Letter.*

*William T. Coleman, Jr.,* argued the cause for respondents. With him on the brief were *Aaron S. Bayer, Howard A. Belodoff,* and *Charles Johnson III.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Francis X. Bellotti,* Attorney General of Massachusetts,

JUSTICE STEVENS delivered the opinion of the Court.

The Civil Rights Attorney's Fees Awards Act of 1976 (Fees Act) provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee" in

---

and *Ellen Janos* and *Carl Valvo*, Assistant Attorneys General, *Charles A. Graddick*, Attorney General of Alabama, *Harold Brown*, Attorney General of Alaska, *Robert K. Corbin*, Attorney General of Arizona, and *Anthony Ching*, Solicitor General, *John Steven Clark*, Attorney General of Arkansas, *John Van de Kamp*, Attorney General of California, *Duane Woodard*, Attorney General of Colorado, *Charles M. Oberly*, Attorney General of Delaware, *Jim Smith*, Attorney General of Florida, *Michael J. Bowers*, Attorney General of Georgia, *Richard G. Opper*, Attorney General of Guam, *Corinne Watanabe*, Acting Attorney General of Hawaii, *Linley E. Pearson*, Attorney General of Indiana, *Thomas J. Miller*, Attorney General of Iowa, *Robert T. Stephan*, Attorney General of Kansas, *David L. Armstrong*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, *Stephen H. Sachs*, Attorney General of Maryland, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Edwin Lloyd Pittman*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Mike Greely*, Attorney General of Montana, *Brian McKay*, Attorney General of Nevada, *Stephen E. Merrill*, Attorney General of New Hampshire, *Irwin I. Kimmelman*, Attorney General of New Jersey, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas Spaeth*, Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Michael Turpen*, Attorney General of Oklahoma, *David Frohnmayer*, Attorney General of Oregon, *Leroy S. Zimmerman*, Attorney General of Pennsylvania, *Hector Rivera-Cruz*, Attorney General of Puerto Rico, *Arlene Violet*, Attorney General of Rhode Island, *Travis Medlock*, Attorney General of South Carolina, *Mark V. Meierhenry*, Attorney General of South Dakota, *W. J. Michael Cody*, Attorney General of Tennessee, *Jim Mattox*, Attorney General of Texas, *David L. Wilkinson*, Attorney General of Utah, *Jeffrey Amestoy*, Attorney General of Vermont, *William J. Broaddus*, Attorney General of Virginia, *Victor G. Schneider*, Acting Attorney General of the Virgin Islands, *Kenneth O. Eikenberry*, Attorney General of Washington, *Charlie Brown*, Attorney General of West Virginia, *Bronson C. La Follette*, Attorney General of Wisconsin, and *A. G. McClintock*, Attorney General of Wyoming; for the City of New York by *Frederick A. O. Schwarz, Jr., Leonard Koerner*, and *Paul T. Rephen*; for the Council of State Governments et al. by *Benna Ruth Solomon* and *J. Phillip Jordan*;

enumerated civil rights actions. 90 Stat. 2641, 42 U. S. C. § 1988. In *Maher* v. *Gagne*, 448 U. S. 122 (1980), we held that fees *may* be assessed against state officials after a case has been settled by the entry of a consent decree. In this case, we consider the question whether attorney's fees *must* be assessed when the case has been settled by a consent decree granting prospective relief to the plaintiff class but providing that the defendants shall not pay any part of the prevailing party's fees or costs. We hold that the District Court has the power, in its sound discretion, to refuse to award fees.

I

The petitioners are the Governor and other public officials of the State of Idaho responsible for the education and treatment of children who suffer from emotional and mental handicaps. Respondents are a class of such children who have been or will be placed in petitioners' care.[1]

On August 4, 1980, respondents commenced this action by filing a complaint against petitioners in the United States District Court for the District of Idaho. The factual allegations in the complaint described deficiencies in both the educational programs and the health care services provided respondents. These deficiencies allegedly violated the United States Constitution, the Idaho Constitution, four

---

and for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby.*

Briefs of *amici curiae* urging affirmance were filed for the Committee on Legal Assistance of the Association of the Bar of the City of New York by *Allan L. Gropper;* and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers, Charles Stephen Ralston, Steven L. Winter, E. Richard Larson, Burt Neuborne, James Robertson, Harold R. Tyler, Jr., Norman Redlich, William L. Robinson, Norman J. Chachkin, Kalman Finkel, Helaine M. Barnett,* and *John E. Kirklin.*

[1] The number of children in petitioners' custody, as well as the duration of that custody, fluctuates to a certain degree. Although it appears that only 40 or 50 children are in custody at any one moment, the membership in respondents' class is apparently well over 2,000. App. 61.

federal statutes, and certain provisions of the Idaho Code. The complaint prayed for injunctive relief and for an award of costs and attorney's fees, but it did not seek damages.

On the day the complaint was filed, the District Court entered two orders, one granting the respondents leave to proceed *in forma pauperis*, and a second appointing Charles Johnson as their next friend for the sole purpose of instituting and prosecuting the action. At that time Johnson was employed by the Idaho Legal Aid Society, Inc., a private, nonprofit corporation that provides free legal services to qualified low-income persons.[2] Because the Idaho Legal Aid Society is prohibited from representing clients who are capable of paying their own fees,[3] it made no agreement requiring any of the respondents to pay for the costs of litigation or the legal services it provided through Johnson. Moreover, the special character of both the class and its attorney-client relationship with Johnson explains why it did not enter into any agreement covering the various contingencies that might arise during the course of settlement negotiations of a class action of this kind.

Shortly after petitioners filed their answer, and before substantial work had been done on the case, the parties entered into settlement negotiations. They were able to reach agreement concerning that part of the complaint relating to educational services with relative ease and, on October 14, 1981, entered into a stipulation disposing of that part of the case. The stipulation provided that each party would bear its "own attorney's fees and costs thus far incurred." App.

---

[2] Although Johnson subsequently entered private practice and apparently bore some of the financial burden of the litigation himself, any award of costs or fees would inure to the benefit of Idaho Legal Aid. Brief for Plaintiffs in Support of Motion for Consideration of Costs and Attorney Fees in *Jeff D.* v. *Evans*, No. 80–4091 (D. Idaho), p. 6.

[3] Idaho Legal Aid receives grants under the Legal Services Corporation Act, 42 U. S. C. §§ 2996–2996l, and is not allowed to represent clients who are capable of paying their own legal fees, see § 2996f(b)(1); 45 CFR § 1609 (1984).

54. The District Court promptly entered an order approving the partial settlement.

Negotiations concerning the treatment claims broke down, however, and the parties filed cross-motions for summary judgment. Although the District Court dismissed several of respondents' claims, it held that the federal constitutional claims raised genuine issues of fact to be resolved at trial. Thereafter, the parties stipulated to the entry of a class certification order, engaged in discovery, and otherwise prepared to try the case in the spring of 1983.

In March 1983, one week before trial, petitioners presented respondents with a new settlement proposal. As respondents themselves characterize it, the proposal "offered virtually all of the injunctive relief [they] had sought in their complaint." Brief for Respondents 5. See App. 89. The Court of Appeals agreed with this characterization, and further noted that the proposed relief was "more than the district court in earlier hearings had indicated it was willing to grant." 743 F. 2d 648, 650 (CA9 1984). As was true of the earlier partial settlement, however, petitioners' offer included a provision for a waiver by respondents of any claim to fees or costs.[4] Originally, this waiver was unacceptable to the Idaho Legal Aid Society, which had instructed Johnson to reject any settlement offer conditioned upon a waiver of fees, but Johnson ultimately determined that his ethical obligation to his clients mandated acceptance of the proposal. The parties conditioned the waiver on approval by the District Court.[5]

---

[4] Petitioners append to their brief on the merits the parties' correspondence setting forth their respective positions on settlement. Without embarking on a letter-by-letter discussion of the status of the fee waiver in the bargaining, it is clear that petitioners' proposals uniformly included fee waivers while respondents' almost always did not.

[5] Paragraph 25 of the settlement agreement provides:

"Plaintiffs and defendants shall each bear their own costs and attorney's fees thus far incurred, if so approved by the Court." App. 104.

After the stipulation was signed, Johnson filed a written motion requesting the District Court to approve the settlement "except for the provision on costs and attorney's fees," and to allow respondents to present a bill of costs and fees for consideration by the court.   App. 87.   At the oral argument on that motion, Johnson contended that petitioners' offer had exploited his ethical duty to his clients—that he was "forced," by an offer giving his clients "the best result [they] could have gotten in this court or any other court," to waive his attorney's fees.[6]   The District Court, however, evaluated the waiver in the context of the entire settlement and rejected the ethical underpinnings of Johnson's argument.   Explaining that although petitioners were "not willing to concede that they were obligated to [make the changes in their practices required by the stipulation], . . . they were willing to do them as long as their costs were outlined and they didn't face additional costs," it concluded that "it doesn't violate any ethical considerations for an attorney to give up his attorney fees in the interest of getting a better bargain for his client[s]."   *Id.*, at 93.   Accordingly, the District Court ap-

---

In addition, the entire settlement agreement was conditioned on the District Court's approval of the waiver provision under Federal Rule of Civil Procedure 23(e).   See nn. 7 and 8, *infra*.

[6]Johnson's oral presentation to the District Court reads in full as follows:

"In other words, an attorney like myself can be put in the position of either negotiating for his client or negotiating for his attorney's fees, and I think that that is pretty much the situation that occurred in this instance.

"I was forced, because of what I perceived to be a result favorable to the plaintiff class, a result that I didn't want to see jeopardized by a trial or by any other possible problems that might have occurred.   And the result is the best result I could have gotten in this court or any other court and it is really a fair and just result in any instance and what should have occurred years earlier and which in fact should have been the case all along.   That result I didn't want to see disturbed on the basis that my attorney's fees would cause a problem and cause that result to be jeopardized."   App. 90–91.

proved the settlement and denied the motion to submit a costs bill.

When respondents appealed from the order denying attorney's fees and costs, petitioners filed a motion requesting the District Court to suspend or stay their obligation to comply with the substantive terms of the settlement. Because the District Court regarded the fee waiver as a material term of the complete settlement, it granted the motion.[7] The Court of Appeals, however, granted two emergency motions for stays requiring enforcement of the substantive terms of the consent decree pending the appeal. More dramatically, after ordering preliminary relief, it invalidated the fee waiver and left standing the remainder of the settlement; it then instructed the District Court to "make its own determination of the fees that are reasonable" and remanded for that limited purpose. 743 F. 2d, at 652.

In explaining its holding, the Court of Appeals emphasized that Rule 23(e) of the Federal Rules of Civil Procedure gives the court the power to approve the terms of all settlements of class actions,[8] and that the strong federal policy embodied in

---

[7] The District Court wrote a letter to respondents' counsel explaining the conditional nature of petitioners' settlement offer:

"[T]he defendants' signing of the stipulation was dependent upon the Court's approval of the finding that it was appropriate to accept a stipulation where plaintiffs waived attorneys fees. . . . The defendants entered into the stipulation only as a compromise matter with the understanding that they would not pay any attorneys fees, and advised the Court that if there were going to be attorneys fees that they wanted to proceed with trial because they did not think they were required to conform to the stipulation legally. Under those circumstances, it would be entirely inappropriate to leave the stipulation in effect. If you effectively challenge the stipulation, the whole stipulation falls and the matter must be tried by the Court. On the other hand, if you do not successfully challenge the stipulation, then the stipulation and stay is in effect. But until the validity of the stipulation is determined, the Court feels it is entirely unfair to enforce it." *Id.*, at 115–116. See *id.*, at 112.

[8] "Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed

the Fees Act normally requires an award of fees to prevailing plaintiffs in civil rights actions, including those who have prevailed through settlement.[9]   The court added that "[w]hen attorney's fees are negotiated as part of a class action settlement, a conflict frequently exists between the class lawyers' interest in compensation and the class members' interest in relief."   743 F. 2d, at 651–652.   "To avoid this conflict," the Court of Appeals relied on Circuit precedent which had "disapproved simultaneous negotiation of settlements and attorney's fees" absent a showing of "unusual circumstances." *Id.,* at 652.[10]   In this case, the Court of Appeals found no such "unusual circumstances" and therefore held that an agreement on fees "should not have been a part of the settlement of the claims of the class."   *Ibid.*   It concluded:

> "The historical background of both Rule 23 and section 1988, as well as our experience since their enactment, compel the conclusion that a stipulated waiver of all attorney's fees obtained solely as a condition for obtaining relief for the class should not be accepted by the court." *Ibid.*

dismissal or compromise shall be given to all members of the class in such manner as the court directs."   Fed. Rule Civ. Proc. 23(e).

[9] As we held in *Maher* v. *Gagne,* 448 U. S. 122, 129 (1980): "The fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees."   See *ibid.* (quoting S. Rep. No. 94–1011, p. 5 (1976)).   Nor does the fact that the fee award would benefit a legal services corporation justify a refusal to make an award.   See *New York Gaslight Club, Inc.* v. *Carey,* 447 U. S. 54, 70–71, n. 9 (1980); H. R. Rep. No. 94–1558, pp. 5 and 8, n. 16 (1976).

[10] That precedent, *Mendoza* v. *United States,* 623 F. 2d 1338 (CA9 1980), like the Third Circuit decision in *Prandini* v. *National Tea Co.,* 557 F. 2d 1015 (1977), which both the *Mendoza* court and the panel below cited approvingly, instituted a ban on simultaneous negotiations of merits and attorney's fees issues to prevent attorneys from trading relief benefiting the class for a more generous fee for themselves.   See *Mendoza* v. *United States, supra,* at 1352–1353; *Prandini* v. *National Tea Co.,* 557 F. 2d, at 1020–1021.   In neither of those cases had the court rejected a part of the settlement and enforced the remainder.

The importance of the question decided by the Court of Appeals, together with the conflict between its decision and the decisions of other Courts of Appeals,[11] led us to grant certiorari. 471 U. S. 1098 (1985). We now reverse.

## II

The disagreement between the parties and *amici* as to what exactly is at issue in this case makes it appropriate to put certain aspects of the case to one side in order to state precisely the question that the case does present.

To begin with, the Court of Appeals' decision rested on an erroneous view of the District Court's power to approve settlements in class actions. Rule 23(e) wisely requires court approval of the terms of any settlement of a class action, but the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed. Although changed circumstances may justify a court-ordered modification of a consent decree over the objections of a party after the decree has been entered,[12] and the District Court

---

[11] On the question whether it is ever proper to put plaintiff's counsel to the choice of recommending acceptance of a favorable settlement or pursuing a statutory fee award, the decision of the Ninth Circuit below is in accord with the rule prevailing in the Third Circuit, see *Prandini* v. *National Tea Co.*, 557 F. 2d, at 1021 (not recognizing an exception for "unusual circumstances"); cf. *El Club Del Barrio, Inc.* v. *United Community Corps.*, 735 F. 2d 98, 101, n. 3 (CA3 1984) (dictum noting applicability of *Prandini* to fee waivers in holding that such waivers must be explicit), and conflicts with decisions in four other Circuits holding that civil rights plaintiffs are free to waive fee awards as part of an overall settlement, at least in some circumstances, see *Moore* v. *National Assn. of Security Dealers, Inc.*, 246 U. S. App. D. C. 114, 125, 762 F. 2d 1093, 1104 (1985) (opinion of Mac-Kinnon, J.); *id.*, at 134–135, 762 F. 2d, at 1113–1114 (Wald, J., concurring in judgment); *Lazar* v. *Pierce*, 757 F. 2d 435, 438–439 (CA1 1985); *Gram* v. *Bank of Louisiana*, 691 F. 2d 728, 730 (CA5 1982) (dictum); *Chicano Police Officer's Assn.* v. *Stover*, 624 F. 2d 127, 132 (CA10 1980).

[12] See *Pasadena City Board of Education* v. *Spangler*, 427 U. S. 424, 437 (1976); *United States* v. *United Shoe Machinery Corp.*, 391 U. S. 244,

might have advised petitioners and respondents that it would not approve their proposal unless one or more of its provisions was deleted or modified, Rule 23(e) does not give the court the power, in advance of trial, to modify a proposed consent decree and order its acceptance over either party's objection.[18] The options available to the District Court were essentially the same as those available to respondents: it could have accepted the proposed settlement; it could have rejected the proposal and postponed the trial to see if a different settlement could be achieved; or it could have decided to try the case. The District Court could not enforce the settlement on the merits and award attorney's fees anymore than it could, in a situation in which the attorney had negotiated a large fee at the expense of the plaintiff class, preserve the fee award and order greater relief on the merits. The question we must decide, therefore, is whether the District Court had a duty to reject the proposed settlement because it included a waiver of statutorily authorized attorney's fees.

That duty, whether it takes the form of a general prophylactic rule or arises out of the special circumstances of this case, derives ultimately from the Fees Act rather than from the strictures of professional ethics. Although respondents contend that Johnson, as counsel for the class, was faced with an "ethical dilemma" when petitioners offered him relief greater than that which he could reasonably have expected to obtain for his clients at trial (if only he would stipulate to a waiver of the statutory fee award), and although we recognize Johnson's conflicting interests between pursuing relief for the class and a fee for the Idaho Legal Aid Society, we do

---

251 (1968); *Railway Employees* v. *Wright*, 364 U. S. 642, 651 (1961); *United States* v. *Swift & Co.*, 286 U. S. 106, 114 (1932).

[18] Cf. *Firefighters* v. *Stotts*, 467 U. S. 561, 592 (1984) (STEVENS, J., concurring in judgment); Restatement (Second) of Contracts § 184, Comment a, p. 30 (1981) ("If the performance as to which the agreement is unenforceable [as against public policy] is an essential part of the agreed exchange, . . . the entire agreement [is] unenforceable"); E. Farnsworth, Contracts § 5.8, p. 361 (1982).

not believe that the "dilemma" was an "ethical" one in the sense that Johnson had to choose between conflicting duties under the prevailing norms of professional conduct. Plainly, Johnson had no *ethical* obligation to seek a statutory fee award. His ethical duty was to serve his clients loyally and competently.[14] Since the proposal to settle the merits was more favorable than the probable outcome of the trial, Johnson's decision to recommend acceptance was consistent with the highest standards of our profession. The District Court, therefore, correctly concluded that approval of the settlement involved no breach of ethics in this case.

The defect, if any, in the negotiated fee waiver must be traced not to the rules of ethics but to the Fees Act.[15] Fol-

---

[14] Generally speaking, a lawyer is under an ethical obligation to exercise independent professional judgment on behalf of his client; he must not allow his own interests, financial or otherwise, to influence his professional advice. ABA, Model Code of Professional Responsibility EC 5-1, 5-2 (as amended 1980); ABA, Model Rules of Professional Conduct 1.7(b), 2.1 (as amended 1984). Accordingly, it is argued that an attorney is required to evaluate a settlement offer on the basis of his client's interest, without considering his own interest in obtaining a fee; upon recommending settlement, he must abide by the client's decision whether or not to accept the offer, see Model Code of Professional Responsibility EC 7-7 to EC 7-9; Model Rules of Professional Conduct 1.2(a).

[15] Even state bar opinions holding it unethical for defendants to request fee waivers in exchange for relief on the merits of plaintiffs' claims are bottomed ultimately on § 1988. See District of Columbia Bar Legal Ethics Committee, Op. No. 147, reprinted in 113 Daily Wash. L. Rep. 389, 394–395 (1985); Committee on Professional and Judicial Ethics of the New York City Bar Association, Op. No. 82–80, p. 1 (1985); *id.*, at 4–5 (dissenting opinion); Committee on Professional and Judicial Ethics of the New York City Bar Association, Op. No. 80–94, reprinted in 36 Record of N. Y. C. B. A. 507, 508–511 (1981); Grievance Commission of Board of Overseers of the Bar of Maine, Op. No. 17, reprinted in Advisory Opinions of the Grievance Commission of the Board of Overseers of the Bar 69–70 (1983). For the sake of completeness, it should be mentioned that the bar is not of one mind on this ethical judgment. See Final Subcommittee Report of the Committee on Attorney's Fees of the Judicial Conference of the United State Court of Appeals for the District of Columbia Circuit, reprinted in 13

lowing this tack, respondents argue that the statute must be construed to forbid a fee waiver that is the product of "coercion." They submit that a "coercive waiver" results when the defendant in a civil rights action (1) offers a settlement on the merits of equal or greater value than that which plaintiffs could reasonably expect to achieve at trial but (2) conditions the offer on a waiver of plaintiffs' statutory eligibility for attorney's fees. Such an offer, they claim, exploits the ethical obligation of plaintiffs' counsel to recommend settlement in order to avoid defendant's statutory liability for its opponents' fees and costs.[16]

The question this case presents, then, is whether the Fees Act requires a district court to disapprove a stipulation seeking to settle a civil rights class action under Rule 23 when the offered relief equals or exceeds the probable outcome at trial but is expressly conditioned on waiver of statutory eligibility for attorney's fees. For reasons set out below, we are not persuaded that Congress has commanded that all such settlements must be rejected by the District Court. Moreover, on the facts of record in this case, we are satisfied that the Dis-

---

Bar Rep. 4, 6 (1984) (declining to adopt flat rule forbidding waivers of statutory fees). Cf. State Bar of Georgia, Op. No. 39, reprinted in 10 Ga. St. Bar News No. 2, p. 5 (1984) (rejecting the reasoning of the Committee on Professional and Judicial Ethics of the New York City Bar Association in the context of lump-sum settlement offers for the reason, among others, that "[t]o force a defendant into proposing a settlement offer wherein plaintiffs['] statutory attorney fees are not negotiated . . . [means that] meaningful settlement proposals might never be made. Such a situation undeniably . . . is inimical to the resolution of disputes between parties").

[16] See Committee on Professional and Judicial Ethics of the New York City Bar Association, Op. No. 80–94, reprinted in 36 Record of N. Y. C. B. A., at 508 ("Defense counsel thus are in a uniquely favorable position when they condition settlement on the waiver of the statutory fee: they make a demand for a benefit which the plaintiff's lawyer cannot resist as a matter of ethics and which the plaintiff will not resist due to lack of interest"). Accord, District of Columbia Bar Legal Ethics Committee, Op. No. 147, reprinted in 113 Daily Wash. L. Rep., at 394.

trict Court did not abuse its discretion by approving the fee waiver.

## III

The text of the Fees Act provides no support for the proposition that Congress intended to ban all fee waivers offered in connection with substantial relief on the merits.[17]    On the contrary, the language of the Act, as well as its legislative history, indicates that Congress bestowed on the "prevailing *party*" (generally plaintiffs[18]) a statutory eligibility for a discretionary award of attorney's fees in specified civil rights actions.[19]    It did not prevent the party from waiving this eli-

_____

[17] The operative language of the Fees Act provides, in its entirety:

"In any action or proceeding to enforce a provision of sections 1977, 1978, 1979, 1980, and 1981 of the Revised Statutes, title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 90 Stat. 2641, 42 U. S. C. § 1988.

[18] See H. R. Rep. No. 94–1558, pp. 6–7 (1976); S. Rep. No. 94–1011, pp. 4–5, and n. 4 (1976); 122 Cong. Rec. 35122–35123 (1976) (remarks of Rep. Drinan); *id.*, at 35125 (remarks of Rep. Kastenmeier).

[19] This straightforward reading of § 1988 accords with the view held by the majority of the Courts of Appeals.    See, *e. g., Jonas* v. *Stack,* 758 F. 2d 567, 570, n. 7 (CA11 1985) ("Strict conformity to the language of [§ 1988] would require that the [fee] application be made by the attorney in the name of his client, the prevailing party.    We consider this to be the procedure of choice, since it ensures that awards made under the Act compensate their intended beneficiaries"); *Brown* v. *General Motors Corp.,* 722 F. 2d 1009, 1011 (CA2 1983) ("Under [42 U. S. C. § 1988] it is the prevailing party rather than the lawyer who is entitled to attorney's fees"); *Cooper* v. *Singer,* 719 F. 2d 1496, 1506–1507 (CA10 1983) (distinguishing between client's and counsel's entitlement to fees in the course of holding that "if the *client's* section 1988 fee award . . . is less than the amount owed to the attorney under the contingent fee agreement, then the lawyer will be expected to reduce his fee to the amount awarded by the courts" (emphasis added)); *White* v. *New Hampshire Dept. of Employment Security,* 629 F. 2d 697, 703 (CA1 1980) ("[A]ward of attorney's fees goes to 'prevailing party,' rather than attorney"), rev'd on other grounds, 455 U. S. 445

gibility anymore than it legislated against assignment of this right to an attorney, such as effectively occurred here. Instead, Congress enacted the fee-shifting provision as "an integral part of the remedies necessary to obtain" compliance with civil rights laws, S. Rep. No. 94-1011, p. 5 (1976), to further the same general purpose—promotion of respect for civil rights—that led it to provide damages and injunctive relief. The statute and its legislative history nowhere suggest that Congress intended to forbid *all* waivers of attorney's fees—even those insisted upon by a civil rights plaintiff in exchange for some other relief to which he is indisputably not entitled[20]—anymore than it intended to bar a concession on damages to secure broader injunctive relief. Thus, while it is undoubtedly true that Congress expected fee shifting to attract competent counsel to represent citizens deprived of their civil rights,[21] it neither bestowed fee awards upon attor-

_____

(1982). But cf. *James* v. *Home Construction Co. of Mobil Inc.*, 689 F. 2d 1357, 1358–1359 (CA11 1982) (disagreeing with *Smith* v. *South Side Loan Co.*, 567 F. 2d 306, 307 (CA5 1978) ("[A]n award [of attorney's fees] is the right of the party suing not the attorney representing him"), and construing Truth in Lending Act's mandatory award of attorney's fees as "creat[ing] a right of action for attorneys to seek fee awards after settlement of the plaintiff's claim." 689 F. 2d, at 1359).

[20] Judge Wald has described the use of attorney's fees as a "bargaining chip" useful to plaintiffs as well as defendants. In her opinion concurring in the judgment in *Moore* v. *National Assn. of Security Dealers, Inc.*, she wrote:

"On the other hand, the *Jeff D.* approach probably means that a defendant who is willing to grant immediate prospective relief to a plaintiff case, but would rather gamble on the outcome at trial than pay attorneys' fees and costs up front, will never settle. In short, removing attorneys' fees as a 'bargaining chip' cuts both ways. It prevents defendants, who in Title VII cases are likely to have greater economic power than plaintiffs, from exploiting that power in a particularly objectionable way; but it also deprives plaintiffs of the use of that chip, even when without it settlement may be impossible and the prospect of winning at trial may be very doubtful." 246 U. S. App. D. C., at 133, 762 F. 2d, at 1112.

[21] See H. R. Rep. No. 94-1558, *supra*, at 1, 9; S. Rep. No. 94-1011, *supra*, at 2, 6; 122 Cong. Rec. 33313–33314 (1976) (remarks of Sen. Tun-

neys nor rendered them nonwaivable or nonnegotiable; instead, it added them to the arsenal of remedies available to combat violations of civil rights, a goal not invariably inconsistent with conditioning settlement on the merits on a waiver of statutory attorney's fees.[22]

In fact, we believe that a general proscription against negotiated waiver of attorney's fees in exchange for a settlement on the merits would itself impede vindication of civil rights, at least in some cases, by reducing the attractiveness of settlement. Of particular relevance in this regard is our recent decision in *Marek* v. *Chesny*, 473 U. S. 1 (1985). In that case, which admittedly was not a class action and therefore did not implicate the court's approval power under Rule 23(e), we specifically considered and rejected the contention that civil rights actions should be treated differently from other civil actions for purposes of settlement. As THE CHIEF JUSTICE explained in his opinion for the Court, the settlement of litigation provides benefits for civil rights plain-

---

ney); *id.*, at 33314–33315 (remarks of Sen. Kennedy); *id.*, at 35128 (remarks of Rep. Seiberling).

[22] Indeed, Congress specifically rejected a mandatory fee-shifting provision, see H. R. Rep. No. 94–1558, *supra*, at 3, 5, 8; 122 Cong. Rec. 35123 (1976) (remarks of Rep. Drinan), a proposal which the dissent would virtually reinstate under the guise of carrying out the legislative will. Even proponents of nonwaivable fee awards under § 1988 concede that "one would have to strain principles of statutory interpretation to conclude that Congress intended to utilize fee non-negotiability to achieve the purposes of section 1988." Calhoun, Attorney-Client Conflicts of Interest and the Concept of Non-Negotiable Fee Awards under 42 U. S. C. § 1988, 55 U. Colo. L. Rev. 341, 385 (1984). This conclusion is buttressed by Congress' decision to emulate the "over fifty" fee-shifting provisions that had been successful in enlisting the aid of "private attorneys general" in the prosecution of other federal statutes that had been on the books for decades. H. R. Rep. No. 94–1558, *supra*, at 3, 5. Accord, S. Rep. No. 94–1011, *supra*, at 3. See also 122 Cong. Rec., *supra*, at 35123 (appendix to remarks of Rep. Drinan) (listing more than 50 fee-shifting statutes). No one has suggested that the purpose of any of those fee-shifting provisions has been frustrated by the absence of a prohibition against fee waivers.

tiffs as well as defendants and is consistent with the purposes of the Fees Act:

> "There is no evidence, however, that Congress, in considering § 1988, had any thought that civil rights claims were to be on any different footing from other civil claims insofar as settlement is concerned. Indeed, Congress made clear its concern that civil rights plaintiffs not be penalized for 'helping to lessen docket congestion' by settling their cases out of court. See H. R. Rep. No. 94–1558, *supra*, at 7.
>
> ". . . Some plaintiffs will receive compensation in settlement where, on trial, they might not have recovered, or would have recovered less than what was offered. And, even for those who would prevail at trial, settlement will provide them with compensation at an earlier date without the burdens, stress, and time of litigation. In short, settlements rather than litigation will serve the interests of plaintiffs as well as defendants." 473 U. S., at 10.

To promote both settlement and civil rights, we implicitly acknowledged in *Marek* v. *Chesny* the possibility of a tradeoff between merits relief and attorney's fees when we upheld the defendant's lump-sum offer to settle the entire civil rights action, including any liability for fees and costs.

In approving the package offer in *Marek* v. *Chesny* we recognized that a rule prohibiting the comprehensive negotiation of all outstanding issues in a pending case might well preclude the settlement of a substantial number of cases:

> "If defendants are not allowed to make lump-sum offers that would, if accepted, represent their total liability, they would understandably be reluctant to make settlement offers. As the Court of Appeals observed, 'many a defendant would be unwilling to make a binding settlement offer on terms that left it exposed to liability for attorney's fees in whatever amount the court might

fix on motion of the plaintiff.' 720 F. 2d, at 477." *Id.*, at 6–7.

See *White* v. *New Hampshire Dept. of Employment Security*, 455 U. S. 445, 454, n. 15 (1982) ("In considering whether to enter a negotiated settlement, a defendant may have good reason to demand to know his total liability from both damages and fees").

Most defendants are unlikely to settle unless the cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation, are greater than the cost of the settlement package. If fee waivers cannot be negotiated, the settlement package must either contain an attorney's fee component of potentially large and typically uncertain magnitude, or else the parties must agree to have the fee fixed by the court. Although either of these alternatives may well be acceptable in many cases, there surely is a significant number in which neither alternative will be as satisfactory as a decision to try the entire case.[23]

The adverse impact of removing attorney's fees and costs from bargaining might be tolerable if the uncertainty introduced into settlement negotiations were small. But it is not. The defendants' potential liability for fees in this kind of litigation can be as significant as, and sometimes even more significant than, their potential liability on the merits. This proposition is most dramatically illustrated by the fee awards

---

[23] It is unrealistic to assume that the defendant's offer on the merits would be unchanged by redaction of the provision waiving fees. If it were, the defendant's incentive to settle would be diminished because of the risk that attorney's fees, when added to the original merits offer, will exceed the discounted value of the expected judgment plus litigation costs. If, as is more likely, the defendant lowered the value of its offer on the merits to provide a cushion against the possibility of a large fee award, the defendant's offer on the merits will in many cases be less than the amount to which the plaintiff feels himself entitled, thereby inclining him to reject the settlement. Of course, to the extent that the merits offer is somewhere between these two extremes the incentive of both sides to settle is dampened, albeit to a lesser degree with respect to each party.

of district courts in actions seeking only monetary relief.[24] Although it is more difficult to compare fee awards with the cost of injunctive relief, in part because the cost of such relief is seldom reported in written opinions, here too attorney's fees awarded by district courts have "frequently outrun the economic benefits ultimately obtained by successful litigants." 122 Cong. Rec. 31472 (1976) (remarks of Sen. Kennedy).[25]  Indeed, in this very case "[c]ounsel for defendants view[ed] the risk of an attorney's fees award as the most significant liability in the case."  Brief for Defendants in Support of Approval of Compromise in *Jeff D.* v. *Evans*, No. 80–4091 (D. Idaho), p. 5.  Undoubtedly there are many other civil rights actions in which potential liability for attorney's fees may overshadow the potential cost of relief on the merits and darken prospects for settlement if fees cannot be negotiated.

The unpredictability of attorney's fees may be just as important as their magnitude when a defendant is striving to fix its liability.  Unlike a determination of costs, which ordinarily involve smaller outlays and are more susceptible of calculation, see *Marek* v. *Chesny*, 473 U. S., at 7, "[t]here is no precise rule or formula" for determining attorney's fees,

---

[24] See, *e. g.*, *Rivera* v. *Riverside*, 763 F. 2d 1580, 1581–1583 (CA9 1985) (city ordered to pay victorious civil rights plaintiffs $245,456.25 following a trial in which they recovered a total of $33,350 in damages), cert. granted, 474 U. S. 917 (1985); *Cunningham* v. *City of McKeesport*, 753 F. 2d 262, 269 (CA3 1985) (city ordered to pay some $35,000 in attorney's fees in a case in which judgment for the plaintiff was entered in the amount of $17,000); *Copeland* v. *Marshall*, 205 U. S. App. D. C. 390, 401, 641 F. 2d 880, 891 (1980) (en banc) ($160,000 attorney's fees awarded for obtaining $33,000 judgment); *Skoda* v. *Fontani*, 646 F. 2d 1193, 1194 (CA7), on remand, 519 F. Supp. 309, 310 (ND Ill. 1981) ($6,086.12 attorney's fees awarded to obtain $1 recovery).  Cf. *Marek* v. *Chesny*, 473 U. S., at 7 ($171,692.47 in claimed attorney's fees and costs to obtain $60,000 damages judgment).

[25] See, *e. g.*, *Grendel's Den, Inc.* v. *Larkin*, 749 F. 2d 945, 960 (CA1 1984) (awarding $113,640.85 in fees and expenses for successful challenge to law zoning liquor establishments in *Larkin* v. *Grendel's Den*, 459 U. S. 116 (1982)).

*Hensley* v. *Eckerhart,* 461 U. S. 424, 436 (1983).[26]   Among other considerations, the district court must determine what hours were reasonably expended on what claims, whether that expenditure was reasonable in light of the success obtained, see *id.*, at 436, 440, and what is an appropriate hourly rate for the services rendered.   Some District Courts have also considered whether a "multiplier" or other adjustment is appropriate.   The consequence of this succession of necessarily judgmental decisions for the ultimate fee award is inescapable: a defendant's liability for his opponent's attorney's fees in a civil rights action cannot be fixed with a sufficient degree of confidence to make defendants indifferent to their exclusion from negotiation.[27]   It is therefore not implausible to anticipate that parties to a significant number of civil rights cases will refuse to settle if liability for attorney's fees remains open,[28] thereby forcing more cases to trial, unnec-

---

[26] While this Court has identified "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate" as "[t]he most useful starting point for determining the amount of a reasonable fee," *Hensley* v. *Eckerhart,* 461 U. S., at 433, the "product of reasonable hours times a reasonable rate does not end the inquiry," *id.*, at 434, for "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high." *Blum* v. *Stenson,* 465 U. S. 886, 897 (1984).   "A district court is expressly empowered to exercise discretion in determining whether an award is to be made and if so its reasonableness." *Id.*, at 902, n. 19.   See *Hensley* v. *Eckerhart,* 461 U. S., at 437.   The district court's calculation is thus anything but an arithmetical exercise.

[27] The variability in fee awards is discussed in, for example, Berger, Court Awarded Attorneys' Fees: What is "Reasonable"?, 126 U. Pa. L. Rev. 281, 283-284 (1977); Diamond, The Firestorm over Attorney Fee Awards, 69 A. B. A. J. 1420, 1420 (1983); and National Association of Attorneys General, Report to Congress: Civil Rights Attorney's Fees Awards Act of 1976 (Feb. 3, 1984), reprinted in Hearing on The Legal Fee Equity Act (S. 2802) before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 98th Cong., 2d Sess., 280-293 (1984).

[28] This is the experience of every judge and a majority of the members of a Third Circuit Task Force which concluded that that Circuit's ban on fee negotiations "tends to discourage settlement in some cases and, on occa-

essarily burdening the judicial system, and disserving civil rights litigants. Respondents' own waiver of attorney's fees and costs to obtain settlement of their educational claims is eloquent testimony to the utility of fee waivers in vindicating civil rights claims.[29] We conclude, therefore, that it is not

sion, makes it impossible." Report of the Third Circuit Task Force: Court Awarded Fees 38 (1985) (footnotes omitted). The Task Force reasoned:

"[P]reventing agreement on fees at the time settlement of the merits is discussed . . . makes it difficult for the defendant to ascertain precisely what its liability will be, thereby eliminating the very certainty that makes settlement attractive to the defendant. The net effect . . . may be more trials, thus raising the question whether that cost is justifiable inasmuch as the conflict between settling the merits and discussing fees may be more hypothetical than real." *Ibid.* (footnotes omitted).

[29] Respondents implicitly acknowledge a defendant's need to fix his total liability when they suggest that the parties to a civil rights action should "exchange information" regarding plaintiff's attorney's fees. See, *e. g.*, Committee on Professional and Judicial Ethics of the New York City Bar Association, Op. No. 82–80, p. 2 (1985); Grievance Commission of Board of Overseers of the Bar of Maine, Op. No. 17, Advisory Opinions of the Grievance Commission of the Board of Overseers of the Bar 70 (1983). If this exchange is confined to time records and customary billing rates, the information provides an insufficient basis for forecasting the fee award for the reasons stated above. If the "exchange" is more in the nature of an "assurance" that attorney's fees will not exceed a specified amount, the rule against waiving fees to obtain a favorable settlement on the merits is to that extent breached. Apparently, some parties have circumvented the rule against simultaneous negotiation in one Circuit by means of tacit agreements of this kind. See *El Club Del Barrio, Inc.* v. *United Community Corps.*, 735 F. 2d, at 101, n. 3 (defendants' counsel suggest that the Third Circuit's ban on simultaneous negotiations is "'more honored in the breach'"); A. Miller, Attorneys' Fees in Class Actions 222 (1980) ("Hence even if agreements on fees are not included in settlements, the net result might be to increase informal agreements among counsel or to encourage withholding agreements on fees from the judge until after the settlement is approved"); Comment, Settlement Offers Conditioned Upon Waiver of Attorneys' Fees: Policy, Legal, and Ethical Considerations, 131 U. Pa. L. Rev. 793, 805, n. 90 (1983) (survey of several District Judges serving in the Third Circuit finding exchanges of information being used by plaintiffs' lawyers to "voluntarily reduce the number of compensable hours claimed as an incentive for defendant to settle"). Finally, if counsel for the plain-

necessary to construe the Fees Act as embodying a general rule prohibiting settlements conditioned on the waiver of fees in order to be faithful to the purposes of that Act.[30]

## IV

The question remains whether the District Court abused its discretion in this case by approving a settlement which included a complete fee waiver. As noted earlier, Rule 23(e) wisely requires court approval of the terms of any settlement

---

tiffs are allowed to renege on their informal agreements, the rule against fee waivers will have been vindicated at the expense of future settlements, inasmuch as defendants will be unable to trust assurances made by plaintiffs' counsel.

[30] The Court is unanimous in concluding that the Fees Act should not be interpreted to prohibit all simultaneous negotiations of a defendant's liability on the merits and his liability for his opponent's attorney's fees. See opinion of BRENNAN, J., dissenting, *post*, at 762–763, 764–765. We agree that when the parties find such negotiations conducive to settlement, the public interest, as well as that of the parties, is served by simultaneous negotiations. Cf. *supra*, at 732–734. This reasoning applies not only to individual civil rights actions, but to civil rights class actions as well.

Although the dissent would allow simultaneous negotiations, it would require that "whatever fee the parties agree to" be "found by the court to be a 'reasonable' one under the Fees Act." *Post*, at 754. See *post*, at 753, n. 6. The dissent's proposal is imaginative, but not very practical. Of the 10,757 "other civil rights" cases filed in federal court last year—most of which were 42 U. S. C. § 1983 actions for which § 1988 authorizes an award of fees—only 111 sought class relief. See Annual Report of the Director of the Administrative Office of the United States Courts, An Analysis of the Workload of the Federal Courts for the Twelve Month Period Ended June 30, 1985 pp. 281, 555 (1985). Assuming that of the approximately 99% of these civil rights actions that are not class actions, a further 90% would settle rather than go to trial, the dissent's proposal would require district courts to evaluate the reasonableness of fee agreements in several thousand civil rights cases annually while they make that determination in slightly over 100 civil rights class actions now. Moreover, if this novel procedure really is necessary to carry out the purposes of the Fees Act, presumably it should be applied to all cases arising under federal statutes that provide for fee shifting. But see n. 22, *supra*.

of a class action. The potential conflict among members of the class—in this case, for example, the possible conflict between children primarily interested in better educational programs and those primarily interested in improved health care—fully justifies the requirement of court approval.

The Court of Appeals, respondents, and various *amici* supporting their position, however, suggest that the court's authority to pass on settlements, typically invoked to ensure fair treatment of class members, must be exercised in accordance with the Fees Act to promote the availability of attorneys in civil rights cases. Specifically, respondents assert that the State of Idaho could not pass a valid statute precluding the payment of attorney's fees in settlements of civil rights cases to which the Fees Act applies. See Brief for Respondents 24, n. 22. From this they reason that the Fees Act must equally preclude the adoption of a uniform statewide policy that serves the same end, and accordingly contend that a consistent practice of insisting on a fee waiver as a condition of settlement in civil rights litigation is in conflict with the federal statute authorizing fees for prevailing parties, including those who prevail by way of settlement.[31] Remarkably, there seems little disagreement on these points. Petitioners and the *amici* who support them never suggest that the district court is obligated to place its stamp of approval on every settlement in which the plaintiffs' attorneys have agreed to a fee waiver. The Solicitor General, for ex-

---

[31] See Committee on Professional and Judicial Ethics of the New York City Bar Association, Op. No. 80–94, reprinted in 36 Record of N. Y. C. B. A., 507, 510 (1981) ("[T]he long term effect of persistent demands for the waiver of statutory fees is to . . . undermine efforts to make counsel available to those who cannot afford it"). Accord, District of Columbia Bar Legal Ethics Committee, Op. No. 147, reprinted in 113 Daily Wash. L. Rep. 389, 394 (1985). National staff counsel for the American Civil Liberties Union estimates that requests for fee waivers are made in more than half of all civil rights cases litigated. See Winter, Fee Waiver Requests Unethical: Bar Opinion, 68 A. B. A. J. 23 (1982).

ample, has suggested that a fee waiver need not be approved when the defendant had "no realistic defense on the merits," Brief for United States as *Amicus Curiae* Supporting Reversal 23, n. 9; see *id.*, at 26–27,[32] or if the waiver was part of a "vindictive effort . . . to teach counsel that they had better not bring such cases," Tr. of Oral Arg. 22.

We find it unnecessary to evaluate this argument, however, because the record in this case does not indicate that Idaho has adopted such a statute, policy, or practice. Nor does the record support the narrower proposition that petitioners' request to waive fees was a vindictive effort to deter attorneys from representing plaintiffs in civil rights suits against Idaho. It is true that a fee waiver was requested and obtained as a part of the early settlement of the education claims, but we do not understand respondents to be challenging that waiver, see Tr. of Oral Arg. 31–32, and they have not offered to prove that petitioners' tactics in this case merely implemented a routine state policy designed to frustrate the objectives of the Fees Act. Our own examination of the record reveals no such policy.

---

[32] In this regard, consider the following comment in the Final Subcommittee Report of the Committee on Attorney's Fees of the Judicial Conference of the United States Court of Appeals for the District of Columbia Circuit:

"Against this background, it was agreed that there were certain situations in which the refusal of defense counsel to proceed except on a package basis was improper. For instance, in a Freedom of Information Act case, where a journalist was the plaintiff and either had a reasonably good case, or had won in the district court and the government was considering appeal, it would be improper for government counsel to offer to release the documents, only if plaintiff's counsel agreed to waive all attorneys fees. That situation presents a grossly unfair choice to the plaintiff and his/her counsel, and permitting such offers to be made would seriously undermine the purpose of fee shifting provisions. Moreover, it would serve no end other than saving the government money which it would otherwise have to pay, yet any such saving is plainly at odds with the purpose for which the fee shifting statute was enacted." 13 Bar Rep., at 6.

In light of the record, respondents must—to sustain the judgment in their favor—confront the District Court's finding that the extensive structural relief they obtained constituted an adequate *quid pro quo* for their waiver of attorney's fees.[33] The Court of Appeals did not overturn this finding. Indeed, even that court did not suggest that the option of rejecting the entire settlement and requiring the parties either to try the case or to attempt to negotiate a different settlement would have served the interests of justice. Only by making the unsupported assumption that the respondent class was entitled to retain the favorable portions of the settlement while rejecting the fee waiver could the Court of Appeals conclude that the District Court had acted unwisely.

What the outcome of this settlement illustrates is that the Fees Act has given the victims of civil rights violations a powerful weapon that improves their ability to employ counsel, to obtain access to the courts, and thereafter to vindicate their rights by means of settlement or trial. For aught that appears, it was the "coercive" effect of respondents' statutory right to seek a fee award that motivated petitioners' exceptionally generous offer. Whether this weapon might be even more powerful if fee waivers were prohibited in cases like this is another question,[34] but it is in any event a question

---

[33] From the declarations of respondents' counsel in the lower courts, as well as those of the District Court and the Court of Appeals, all of which are quoted in Part I, *supra*, we understand the District Court's approval of the stipulation settling the health services claims to have rested on the determination that the provision waiving attorney's fees and costs was fair to the class—*i. e.*, the fee waiver was exchanged for injunctive relief of equivalent value.

[34] We are cognizant of the possibility that decisions by individual clients to bargain away fee awards may, in the aggregate and in the long run, diminish lawyers' expectations of statutory fees in civil rights cases. If this occurred, the pool of lawyers willing to represent plaintiffs in such cases might shrink, constricting the "effective access to the judicial process" for persons with civil rights grievances which the Fees Act was intended to provide. H. R. Rep. No. 94–1558, p. 1 (1976). That the "tyranny of small decisions" may operate in this fashion is not to say that there is any

that Congress is best equipped to answer. Thus far, the Legislature has not commanded that fees be paid whenever a case is settled. Unless it issues such a command, we shall rely primarily on the sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in the light of all the relevant circumstances.[35] In this case, the District Court did not

reason or documentation to support such a concern at the present time. Comment on this issue is therefore premature at this juncture. We believe, however, that as a practical matter the likelihood of this circumstance arising is remote. See *Moore* v. *National Assn. of Securities Dealers, Inc.*, 246 U. S. App. D. C., at 133, n. 1, 762 F. 2d, at 1112, n. 1 (Wald, J., concurring in judgment).

[35] "Each negotiation, like each litigant, is unique; reasonableness can only be determined by looking at the strength of the plaintiff's case, the stage at which the settlement is effective, the substantiality of the relief obtained on the merits, and the explanations of the parties as to why they did what they did." *Id.*, at 134, 762 F. 2d, at 1113 (Wald, J., concurring in judgment).

See also the following comment in the opinion of the Final Subcommittee Report of the Committee on Attorney's Fees of the Judicial Conference of the United States Court of Appeals for the District of Columbia Circuit:

"[T]he purpose of such settlement offers is not, in most cases, to create an attorney-client conflict, nor to punish or deter plaintiffs' attorneys from taking on fee shifting cases. Generally speaking, the reason that defendants make such offers is to limit their total exposure.

.        .        .        .        .

"The key in these situations is whether the defendant's offer is reasonable in light of all the circumstances, including the chances of success on the merits and the risk of possible exposure in damages and attorneys fees. And in making such determinations, the legitimate interest of the fee shifting provisions must be balanced against the legitimate interest of the defendant, whether a governmental agency or private party, in making an offer which will fix liability with considerable certainty. This balancing approach applies regardless of whether the issue is phrased in terms of the right of the defendant to make a lump sum settlement offer, or the right to refuse to pay fees to the plaintiff's attorney while providing some measure of relief to the client. In both situations, the inquiry is the same and can be decided only on a case by case basis, assessing the reasonableness of the defendant's conduct." 13 Bar Report, at 6.

abuse its discretion in upholding a fee waiver which secured broad injunctive relief, relief greater than that which plaintiffs could reasonably have expected to achieve at trial.[36]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Ultimately, enforcement of the laws is what really counts. It was with this in mind that Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988 (Act or Fees Act). Congress authorized fee shifting to improve enforcement of civil rights legislation by making it easier for victims of civil rights violations to find lawyers willing to take their cases. Because today's decision will make it more difficult for civil rights plaintiffs to obtain legal assistance, a result plainly contrary to Congress' purpose, I dissent.

I

The Court begins its analysis by emphasizing that neither the language nor the legislative history of the Fees Act supports "the proposition that Congress intended to ban all fee waivers offered in connection with substantial relief on the merits." *Ante,* at 730. I agree. There is no evidence that

---

[36] Although the record in this case does not provide us with any information concerning the amount of money that had been expended on costs, it is appropriate to note that costs other than fees may also be a significant item in class-action litigation. For example, in *Moore* v. *National Assn. of Securities Dealers, Inc., supra,* the class representative's liability for costs amounted to over $30,000 at the time she decided that her best interests would be served by a settlement. 246 U. S. App. D. C., at 116–117, 762 F. 2d, at 1095, 1096, and n. 2 (opinion of MacKinnon, J.). The interest in recovering costs already expended by a class representative may justify a refusal to accept a settlement including only prospective relief and, conversely, the interest in avoiding the additional expenditures associated with continuing the litigation may also justify accepting an otherwise doubtful settlement.

Congress gave the question of fee waivers any thought at all. However, the Court mistakenly assumes that this omission somehow supports the conclusion that fee waivers are permissible. On the contrary, that Congress did not specifically consider the issue of fee waivers tells us absolutely nothing about whether such waivers ought to be permitted. It is black letter law that "[i]n the absence of specific evidence of Congressional intent, it becomes necessary to resort to a broader consideration of the legislative policy behind th[e] provision . . . ." *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S. 697, 706 (1945); see also 2A C. Sands, Sutherland on Statutory Construction §§ 54.01–54.03 (4th ed. 1984). We must interpret the statute in the way that is most consistent with Congress' broader purpose; a result which is "plainly at variance with the policy of the legislation as a whole," *Ozawa* v. *United States*, 260 U. S. 178, 194 (1922), cannot be correct. *Watt* v. *Western Nuclear, Inc.*, 462 U. S. 36, 56 (1983) (statute should not be interpreted "to produce a result at odds with the purposes underlying the statute" but rather "in a way that will further Congress' overriding objective"); 2A Sands, *supra*, § 46.07; see also *United States* v. *Freeman*, 3 How. 556, 565 (1845); *Sorrells* v. *United States*, 287 U. S. 435, 446 (1932); *United States* v. *Brown*, 333 U. S. 18, 25–26 (1948); *Lynch* v. *Overholser*, 369 U. S. 705, 710 (1962); *Perry* v. *Commerce Loan Co.*, 383 U. S. 392, 399–400 (1966) (quoting *United States* v. *American Trucking Assns.*, 310 U. S. 534, 543 (1940)); *United States* v. *Campos-Serrano*, 404 U. S. 293, 298 (1971). Accordingly, the first and most important question to be asked is what Congress' purpose was in enacting the Fees Act. We must then determine whether conditional fee waivers are consistent with this purpose.

## II

The Court asserts that Congress authorized fee awards "to further the same general purpose—promotion of respect for civil rights—that led it to provide damages and injunctive

relief." *Ante,* at 731. The attorney's fee made available by the Act, we are told, is simply an addition to "the arsenal of remedies available to combat violations of civil rights." *Ante,* at 732.

Obviously, the Fees Act is intended to "promote respect for civil rights." Congress would hardly have authorized fee awards in civil rights cases to promote respect for the securities laws. But discourse at such a level of generality is deceptive. The question is *how* did Congress envision that awarding attorney's fees would promote respect for civil rights? Without a clear understanding of the way in which Congress intended for the Fees Act to operate, we cannot even begin responsibly to go about the task of interpreting it. In theory, Congress might have awarded attorney's fees as simply an additional form of make-whole relief, the threat of which would "promote respect for civil rights" by deterring potential civil rights violators. If this were the case, the Court's equation of attorney's fees with damages would not be wholly inaccurate. However, the legislative history of the Fees Act discloses that this is not the case. Rather, Congress provided fee awards to ensure that there would be lawyers available to plaintiffs who could not otherwise afford counsel, so that these plaintiffs could fulfill their role in the federal enforcement scheme as "private attorneys general," vindicating the public interest.[1]

---

[1] This is not to deny that the threat of liability for attorney's fees contributes to compliance with civil rights laws and that this is a desirable effect. See *Hensley* v. *Eckerhart,* 461 U. S. 424, 443, n. 2 (1983) (BRENNAN, J., concurring in part and dissenting in part); see also, *Cooper* v. *Singer,* 719 F. 2d 1496, 1501 (CA10 1983); *Shadis* v. *Beal,* 685 F. 2d 824, 829 (CA3 1982); *Oldham* v. *Ehrlich,* 617 F. 2d 163, 168 (CA8 1980); *Dennis* v. *Chang,* 611 F. 2d 1302, 1306 (CA9 1980); Calhoun, Attorney-Client Conflicts of Interest and the Concept of Non-Negotiable Fee Awards Under 42 U. S. C. § 1988, 55 U. Colo. L. Rev. 341, 343 (1984); Kraus, Ethical and Legal Concerns in Compelling the Waiver of Attorney's Fees by Civil Rights Litigants in Exchange for Favorable Settlement of Cases Under the Civil Rights Attorney's Fees Awards Act of 1976, 29 Vill. L. Rev. 597, 643–644

Before the late 1960's, the concept of fee shifting in public interest litigation was virtually nonexistent. In *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400 (1968) *(per curiam)*, this Court was called upon to interpret the attorney's fee provision of Title II of the then recently enacted Civil Rights Act of 1964, 42 U. S. C. § 2000a–3(b). We held that a prevailing plaintiff should ordinarily recover fees unless special circumstances rendered such an award unjust. Noting that "[w]hen the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law," we recognized that "[a] Title II suit is thus private in form only." *Newman*, 390 U. S., at 401. If a plaintiff obtains relief, he "does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Id.*, at 402 (footnote omitted). We recognized further that the right to recover attorney's fees was conferred by Congress to ensure that this private public-enforcement mechanism would operate effectively:

> "If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees — not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination

(1984). My point is simply that this effect was not what led Congress to enact the Fees Act. Significantly, the Court cites nothing from the legislative history—or anywhere else for that matter—to support its argument that, in awarding attorney's fees to prevailing parties, Congress thought it was merely adding one more remedy to the plaintiff's existing "arsenal." As the discussion which follows clearly establishes, this is because Congress viewed attorney's fees as a special kind of remedy designed to serve a specific purpose.

to seek judicial relief under Title II." *Ibid.* (footnote omitted).

*Newman* interpreted the fee provision of Title II as intended to bridge the gap between the desire of an individual who has been deprived of a federal right to see that right vindicated and the financial ability of that individual to do so. More importantly, *Newman* recognized that Congress did not erect this bridge solely, or even primarily, to confer a benefit on such aggrieved individuals. Rather, Congress sought to capitalize on the happy coincidence that encouraging private actions would, in the long run, provide effective public enforcement of Title II. By ensuring that lawyers would be willing to take Title II cases, Congress made the threat of a lawsuit for violating Title II real, thereby deterring potential violators.

After *Newman,* lower courts—invoking their equitable powers to award attorney's fees—adopted a similar rationale to award fees in cases brought under civil rights statutes that did not contain express provisions for attorney's fees. See, *e. g., Stolberg* v. *Members of Board of Trustees for State Colleges of Conn.,* 474 F. 2d 485 (CA2 1973) (42 U. S. C. § 1983); *Donahue* v. *Staunton,* 471 F. 2d 475 (CA7 1972), cert. denied, 410 U. S. 955 (1973) (same); *Lee* v. *Southern Home Sites Corp.,* 444 F. 2d 143 (CA5 1971) (42 U. S. C. § 1982). See generally Derfner, One Giant Step: The Civil Rights Attorney's Fees Awards Act of 1976, 21 St. Louis U. L. J. 441, 443, and nn. 9–22 (1977) (citing cases). In May 1975, this Court in *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240, ruled that the equitable powers of the federal courts did not authorize fee awards on the ground that a case served the public interest. Although recognizing that "Congress has opted to rely heavily on private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation," the Court held that "congressional utilization of the private-attorney-general concept can in no sense be construed as a grant of authority to the

Judiciary . . . to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award." *Id.*, at 263. Instead, the Court ruled, only Congress could authorize awarding fees as a means of encouraging private actions in the name of public policy. *Id.*, at 269–271.

In the wake of *Alyeska,* Congress acted to correct "anomalous gaps" in the availability of attorney's fees to enforce civil rights laws, S. Rep. No. 94–1011, p. 1 (1976) (hereafter S. Rep.).[2] See H. R. Rep. No. 94–1558, p. 2 (1976) (hereafter H. R. Rep.); 122 Cong. Rec. 31472 (1976) (remarks of Sen. Kennedy). Testimony at hearings on the proposed legislation disclosed that civil rights plaintiffs, "a vast majority of [whom] cannot afford legal counsel," H. R. Rep. 1, were suffering "very severe hardships because of the *Alyeska* decision," *id.*, at 2. The unavailability of fee shifting made it impossible for legal aid services, "already short of resources," to bring many lawsuits, and, without much possibility of compensation, private attorneys were refusing to take civil rights cases. *Id.*, at 3. See generally Hearings on the Effect of Legal Fees on the Adequacy of Representation before the Subcommittee on Representation of Citizen Interests of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., pts. 1–4 (1973). Congress found that *Alyeska* had a "devastating" impact on civil rights litigation, and it concluded that the need for corrective legislation was "compelling." H. R. Rep. 3; see also, 122 Cong. Rec., *supra,* at 31471 (remarks of Sen. Scott), 31472 (remarks of Sen. Kennedy).

Accepting this Court's invitation, see *Alyeska, supra,* at 269–271, Congress passed the Fees Act in order to reestablish the *Newman* regime under which attorney's fees were awarded as a means of securing enforcement of civil rights laws by ensuring that lawyers would be willing to

___
[2] *Alyeska* was decided on May 12, 1975. Senator Tunney introduced S. 2278 on July 31, 1975. The bill was signed by the President and became effective on October 19, 1976.

take civil rights cases. The legislative history manifests this purpose with monotonous clarity. For instance, the Report of the House Judiciary Committee notes "The effective enforcement of Federal civil rights statutes depends largely on the efforts of private citizens. Although some agencies of the United States have civil rights responsibilities, their authority and resources are limited." H. R. Rep. 1. The Report explains, quoting from *Newman*, that a plaintiff who obtains relief in a private lawsuit " 'does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest' importance." *Id.*, at 2 (quoting 390 U. S., at 402). The Report then describes the intended scope and operation of the Fees Act, before concluding:

> "The application of these standards will insure that reasonable fees are awarded to attract competent counsel in cases involving civil and constitutional rights, while avoiding windfalls to attorneys. The effect of [the Fees Act] will be to promote the enforcement of the Federal civil rights acts, as Congress intended, and to achieve uniformity in those statutes and justice for all citizens." H. R. Rep. 9.

These same themes are prominent in the Senate Report:

> "The purpose and effect of [the Fees Act] are simple — it is designed to allow courts to provide the familiar remedy of reasonable counsel fees to prevailing parties in suits to enforce the civil rights acts which Congress has passed since 1866. . . . All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain." S. Rep. 2.

The Senate Report quotes the same language from *Newman* as the House Report, explaining that "fees are an integral

part of the remedy necessary to achieve compliance with our statutory policies." *Id.*, at 3. After citing existing fee-shifting provisions, the Report sets out the Committee's finding that "[t]hese fee shifting provisions have been successful in enabling vigorous enforcement of modern civil rights legislation, while at the same time limiting the growth of the enforcement bureaucracy." *Id.*, at 4. The Report then concludes: "If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases." *Id.*, at 6.

The floor debates, which were extensive, also are replete with similar expressions; I set out but a few examples. Senator Tunney, who sponsored the original version of the Fees Act, stated to the Senate:

"The problem of unequal access to the courts in order to vindicate congressional policies and enforce the law is not simply a problem for lawyers and courts. Encouraging adequate representation is essential if the laws of this Nation are to be enforced. Congress passes a great deal of lofty legislation promising equal rights to all.

"Although some of these laws can be enforced by the Justice Department or other Federal agencies, most of the responsibility for enforcement has to rest upon private citizens, who must go to court to prove a violation of the law. . . . But without the availability of counsel fees, these rights exist only on paper. Private citizens must be given not only the rights to go to court, but also the legal resources. If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." 122 Cong. Rec. 33313 (1976).

Senator Kennedy, who sponsored the amended version of the Fees Act that was actually passed, made the same point somewhat more succinctly:

> "Long experience has demonstrated . . . that Government enforcement alone cannot accomplish [compliance with the civil rights laws]. Private enforcement of these laws by those most directly affected must continue to receive full congressional support. Fee shifting provides a mechanism which can give full effect to our civil rights laws, at no added cost to the Government." *Id.,* at 31472.

But perhaps it was Representative Anderson, responding to a question from an opponent of the Fees Act, who summed up the reason for the legislation most effectively. He said:

> "We are talking here about major civil rights laws. We have an obligation, it seems to me, as the representatives of the people, to make sure that those laws are enforced and we discharge that obligation when we make available a reasonable award of attorneys' fees at the discretion of the court. Those of us who are interested in making sure that those laws are enforced . . . are simply abetting and aiding that process of law enforcement when we agree to the provisions of this bill." *Id.,* at 35116.

See also, *e. g., id.,* at 31471 (remarks of Sen. Scott) ("Congress should encourage citizens to go to court in private suits to vindicate its policies and protect their rights"), 35128 (remarks of Rep. Seiberling).

### III

As this review of the legislative history makes clear, then, by awarding attorney's fees Congress sought to attract competent counsel to represent victims of civil rights violations.[3] Congress' primary purpose was to enable "private attorneys

---

[3] Even the Court acknowledges that "it is undoubtedly true that Congress expected fee shifting to attract competent counsel to represent citizens deprived of their civil rights . . . ." *Ante,* at 731 (footnote omitted). Ironically, the only authority the Court cites from the legislative history is in support of this statement.

general" to protect the public interest by creating economic incentives for lawyers to represent them. The Court's assertion that the Fees Act was intended to do nothing more than give individual victims of civil rights violations another remedy is thus at odds with the whole thrust of the legislation. Congress determined that the public as a whole has an interest in the vindication of the rights conferred by the civil rights statutes over and above the value of a civil rights remedy to a particular plaintiff.[4]

I have gone to great lengths to show how the Court mischaracterizes the purpose of the Fees Act because the Court's error leads it to ask the wrong question. Having concluded that the Fees Act merely creates another remedy to vindicate the rights of individual plaintiffs, the Court asks whether negotiated waivers of statutory attorney's fees are "invariably inconsistent" with the availability of such fees as a remedy for individual plaintiffs. *Ante,* at 732. Not surprisingly, the Court has little difficulty knocking down this frail straw man.[5] But the *proper* question is whether permitting nego-

---

[4] The Court seems to view the options as limited to two: either the Fees Act confers a benefit on attorneys, a conclusion which is contrary to both the language and the legislative history of the Act, *ante,* at 730–731; or the Fees Act confers a benefit on individual plaintiffs, who may freely exploit the statutory fee award to their own best advantage. It apparently has not occurred to the Court that Congress might have made a remedy available to individual plaintiffs primarily for the benefit of the *public.* However, Congress often takes advantage of individual incentives to advance public policy, relying upon "private attorneys general" to secure enforcement of public rights without the need to establish an independent enforcement bureaucracy. As long as the interests of individual plaintiffs coincide with those of the public, it does not matter whether Congress intended primarily to benefit the individual or primarily to benefit the public. However, when individual and public interests diverge, as they may in particular situations, we must interpret the legislation so as not to frustrate Congress' intentions. See *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 704 (1945).

[5] The assumption that fee awards are identical to other remedies like damages or injunctive relief makes it easy for the Court to conclude that

tiated fee waivers is consistent with Congress' goal of attracting competent counsel. It is therefore necessary to consider the effect on *this* goal of allowing individual plaintiffs to negotiate fee waivers.

A

Permitting plaintiffs to negotiate fee waivers in exchange for relief on the merits actually raises two related but distinct questions. First, is it permissible under the Fees Act to negotiate a settlement of attorney's fees simultaneously with the merits? Second, can the "reasonable attorney's fee" guaranteed in the Act be waived? As a matter of logic, either of these practices may be permitted without also permitting the other. For instance, one could require bifurcated settlement negotiations of merits and fees but allow plaintiffs to waive their fee claims during that phase of the negotiations. Alternatively, one could permit simultaneous negotiation of fees and merits but prohibit the plaintiff from waiving statutory fees. This latter possibility exists because there is a *range* of "reasonable attorney's fees" consistent with the Fees Act in any given case. Cf. *Blum* v. *Stenson*, 465 U. S. 886 (1984); *Hensley* v. *Eckerhart*, 461 U. S. 424, 433–437 (1983); H. R. Rep. 8–9; S. Rep. 6; see generally *Johnson* v. *Georgia Highway Express, Inc.*, 488 F. 2d 714, 716–720 (CA5 1974) (listing relevant factors).[6]

More importantly, since simultaneous negotiation and waiver may have different effects on the congressional policy of encouraging counsel to accept civil rights cases, each practice must be analyzed independently to determine whether or

Congress would not have intended to prohibit fee waivers in exchange for relief on the merits "anymore than it intended to bar a concession on damages to secure broader injunctive relief." *Ante*, at 731.

[6] Thus, even if statutory fees cannot be waived, the parties may still want to agree on a fee (or a range of acceptable fees) that they believe to be within the range of fees authorized by the Act. The parties may then, if they choose to do so, make their settlement on the merits contingent upon the district court's approval of their negotiated fee as within the range of "reasonable" fees contemplated by the Fees Act.

not it is consistent with the Fees Act. Unfortunately, the Court overlooks the logical independence of simultaneous negotiation and waiver and assumes that there cannot be one without the other. See *ante*, at 734–738, and n. 28. As a result, the Court's discussion conflates the different effects of these practices, and its opinion is of little use in coming to a fair resolution of this case. An independent examination leads me to conclude: (1) that plaintiffs should not be permitted to waive the "reasonable fee" provided by the Fees Act; but (2) that parties may undertake to negotiate their fee claims simultaneously with the merits so long as whatever fee the parties agree to is found by the court to be a "reasonable" one under the Fees Act.

## B

### 1

It seems obvious that allowing defendants in civil rights cases to condition settlement of the merits on a waiver of statutory attorney's fees will diminish lawyers' expectations of receiving fees and decrease the willingness of lawyers to accept civil rights cases. Even the Court acknowledges "the possibility that decisions by individual clients to bargain away fee awards may, in the aggregate and in the long run, diminish lawyers' expectations of statutory fees in civil rights cases." *Ante*, at 741–742, n. 34. The Court tells us, however, that "[c]omment on this issue" is "premature at this juncture" because there is not yet supporting "documentation." *Ibid.* The Court then goes on anyway to observe that "as a practical matter the likelihood of this circumstance arising is remote." *Ibid.*

I must say that I find the Court's assertions somewhat difficult to understand. To be sure, the impact of conditional fee waivers on the availability of attorneys will be less severe than was the restriction on fee awards created in *Alyeska*. However, that experience surely provides an indication of the immediate hardship suffered by civil rights claimants

whenever there is a reduction in the availability of attorney's fee awards.[7] Moreover, numerous courts and commentators have recognized that permitting fee waivers creates disincentives for lawyers to take civil rights cases and thus makes it more difficult for civil rights plaintiffs to obtain legal assistance. See, *e. g.*, *Moore* v. *National Assn. of Securities Dealers, Inc.*, 246 U. S. App. D. C. 114, 133–134, 762 F. 2d 1093, 1112–1113 (Wald, J., concurring in judgment) *id.*, at 138, 762 F. 2d, at 1117 (Wright, J., dissenting) (1985); *Shadis* v. *Beal*, 685 F. 2d 824, 830–831 (CA3), cert. denied *sub nom. O'Bannon* v. *Shadis*, 459 U. S. 970 (1982); Kraus, 29 Vill. L. Rev., at 625, 633–638; Comment, Settlement Offers Conditioned Upon Waiver of Attorneys' Fees: Policy, Legal, and Ethical Considerations, 131 U. Pa. L. Rev. 793, 814–816 (1983); Committee on Professional and Judicial Ethics of the New York City Bar Association, Op. No. 80–94, reprinted in 36 Record of N. Y. C. B. A. 507, 508–509 (1981).

But it does not require a sociological study to see that permitting fee waivers will make it more difficult for civil rights plaintiffs to obtain legal assistance. It requires only common sense. Assume that a civil rights defendant makes a settlement offer that includes a demand for waiver of statutory attorney's fees. The decision whether to accept or reject the

---

[7] It is especially important to keep in mind the fragile nature of the civil rights bar. Even when attorney's fees are awarded, they do not approach the large sums which can be earned in ordinary commercial litigation. See Berger, Court Awarded Attorneys' Fees: What is "Reasonable"?, 126 U. Pa. L. Rev. 281, 310–315 (1977). It is therefore cost inefficient for private practitioners to devote much time to civil rights cases. Consequently, there are very few civil rights practitioners, and most of these devote only a small part of their time to such cases. Kraus, 29 Vill. L. Rev., at 633–634 (citing studies indicating that less than 1% of lawyers engage in public interest practice). Instead, civil rights plaintiffs must depend largely on legal aid organizations for assistance. These organizations, however, are short of resources and also depend heavily on statutory fees. H. R. Rep. 3; Kraus, *supra*, at 634; see also, *Blum* v. *Stenson*, 465 U. S. 886, 894–895 (1984).

offer is the plaintiff's alone, and the lawyer must abide by the plaintiff's decision. See, *e. g.*, ABA, Model Rules of Professional Conduct 1.2(a) (1984); ABA, Model Code of Professional Responsibility EC 7–7 to EC 7–9 (1982).[8] As a formal matter, of course, the statutory fee belongs to the plaintiff, *ante*, at 730, and n. 19, and thus technically the decision to waive entails a sacrifice only by the plaintiff. As a practical matter, however, waiver affects only the lawyer. Because "a vast majority of the victims of civil rights violations" have no resources to pay attorney's fees, H. R. Rep. 1,[9] lawyers cannot hope to recover fees from the plaintiff and must depend entirely on the Fees Act for compensation.[10] The plain-

---

[8] The attorney is, in fact, obliged to advise the plaintiff whether to accept or reject the settlement offer based on his independent professional judgment, and the lawyer's duty of undivided loyalty requires that he render such advice free from the influence of his or his organization's interest in a fee. See, *e. g.*, ABA, Model Code of Professional Responsibility EC 5–1, EC 5–2, DR 5–101(A) (1982); ABA, Model Rules of Professional Conduct 1.7(b), 2.1 (1984). Thus, counsel must advise a client to accept an offer which includes waiver of the plaintiff's right to recover attorney's fees if, on the whole, the offer is an advantageous one. See, *e. g.*, Commission Op. No. 17 (1981), Advisory Opinions of the Grievance Commission of the Board of Overseers of the Bar of Maine 69, 70 (1983); District of Columbia Bar, Legal Ethics Committee, Op. No. 147, reprinted in 113 Daily Washington Law Reporter 389, 394 (1985). As the discussion in text makes clear, the plaintiff makes no sacrifice by waiving statutory attorney's fees, and thus a settlement offer is not made less attractive by the inclusion of a demand for a fee waiver.

[9] See also S. Rep. 2; 122 Cong. Rec. 31472 (1976) (remarks of Sen. Kennedy); *id.*, at 31832 (remarks of Sen. Hathaway) ("[R]ight now the vindication of important congressional policies in the vital area of civil rights is made to depend upon the financial resources of those least able to promote them"). Indeed, legal aid organizations receiving funds under the Legal Services Corporation Act, 42 U. S. C. §§ 2996–2996*l*, are prohibited from representing individuals who are capable of paying their own legal fees. See § 2996f(b)(1); 45 CFR § 1609 (1985).

[10] Nor can attorneys protect themselves by requiring plaintiffs to sign contingency agreements or retainers at the outset of the representation. *Amici* legal aid societies inform us that they are prohibited by statute, court rule, or Internal Revenue Service regulation from entering into fee

tiff thus has no real stake in the statutory fee and is unaffected by its waiver. See *Lipscomb* v. *Wise,* 643 F. 2d 319, 320 (CA5 1981) *(per curiam).* Consequently, plaintiffs will readily agree to waive fees if this will help them to obtain other relief they desire.[11] As summed up by the Legal Ethics Committee of the District of Columbia Bar:

> "Defense counsel . . . are in a uniquely favorable position when they condition settlement on the waiver of the statutory fee: They make a demand for a benefit that the plaintiff's lawyer cannot resist as a matter of ethics and one in which the plaintiff has no interest and therefore will not resist." Op. No. 147, reprinted in 113 Daily Washington Reporter, *supra* n. 8, at 394.

Of course, from the lawyer's standpoint, things could scarcely have turned out worse. He or she invested consid-

---

agreements with their clients. Brief for NAACP Legal Defense and Educational Fund, Inc., et al. as *Amici Curiae* 10–11; Brief for Committee on Legal Assistance of the Association of the Bar of the City of New York as *Amicus Curiae* 12–13. Moreover, even if such agreements could be negotiated, the possibility of obtaining protection through contingency fee arrangements is unavailable in the very large proportion of civil rights cases which, like this case, seek only injunctive relief. In addition, the Court's misconceived doctrine of state sovereign immunity, see *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 247 (1985) (BRENNAN, J., dissenting), precludes damages suits against governmental bodies, the most frequent civil rights defendants. Finally, even when a suit is for damages, many civil rights actions concern amounts that are too small to provide real compensation through a contingency fee arrangement. Of course, none of the parties has seriously suggested that civil rights attorneys can protect themselves through private arrangements. After all, Congress enacted the Fees Act because, after *Alyeska,* it found such arrangements wholly inadequate. *Supra,* at 748–751.

[11] This result is virtually inevitable in class actions where, even if the class representative feels sympathy for the lawyer's plight, the obligation to represent the interests of absent class members precludes altruistic sacrifice. In class actions on behalf of incompetents, like this one, it is the lawyer himself who must agree to sacrifice his own interests for those of the class he represents. See, *e. g.,* ABA, Model Code of Professional Responsibility EC 7–12 (1982).

erable time and effort in the case, won, and has exactly nothing to show for it. Is the Court really serious in suggesting that it takes a study to prove that this lawyer will be reluctant when, the following week, another civil rights plaintiff enters his office and asks for representation? Does it truly require that somebody conduct a test to see that legal aid services, having invested scarce resources on a case, will feel the pinch when they do not recover a statutory fee?

And, of course, once fee waivers are permitted, defendants will seek them as a matter of course, since this is a logical way to minimize liability. Indeed, defense counsel would be remiss *not* to demand that the plaintiff waive statutory attorney's fees. A lawyer who proposes to have his client pay more than is necessary to end litigation has failed to fulfill his fundamental duty zealously to represent the best interests of his client. Because waiver of fees does not affect the plaintiff, a settlement offer is not made less attractive to the plaintiff if it includes a demand that statutory fees be waived. Thus, in the future, we must expect settlement offers routinely to contain demands for waivers of statutory fees.[12]

The cumulative effect this practice will have on the civil rights bar is evident. It does not denigrate the high ideals that motivate many civil rights practitioners to recognize that lawyers are in the business of practicing law, and that, like other business people, they are and must be concerned with earning a living.[13] The conclusion that permitting fee

---

[12] The Solicitor General's suggestion that we can prohibit waivers sought as part of a "vindictive effort" to teach lawyers not to bring civil rights cases, Tr. of Oral Arg. 22, a point that the Court finds unnecessary to consider, *ante*, at 739–740, is thus irrelevant. Defendants will seek such waivers in every case simply as a matter of sound bargaining. Indeed, the Solicitor General's brief suggests that this will be the bargaining posture of the United States in the future. Brief for United States as *Amicus Curiae* 12–13.

[13] See Johnson, Lawyers' Choice: A Theoretical Appraisal of Litigation Investment Decisions, 15 Law & Soc. Rev. 567 (1980–1981) (concluding that "fee for service" lawyers will withdraw resources from a given case

waivers will seriously impair the ability of civil rights plaintiffs to obtain legal assistance is embarrassingly obvious.

Because making it more difficult for civil rights plaintiffs to obtain legal assistance is precisely the opposite of what Congress sought to achieve by enacting the Fees Act, fee waivers should be prohibited. We have on numerous prior occasions held that "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." *Brooklyn Savings Bank* v. *O'Neil*, 324 U. S., at 704 (holding right to liquidated damages under Fair Labor Standards Act nonwaivable). See also, *e. g.*, *Boyd* v. *Grand Trunk Western R. Co.*, 338 U. S. 263, 266 (1949) (holding venue provision of Federal Employers' Liability Act nonwaivable); *Wilko* v. *Swan*, 346 U. S. 427, 434–438 (1953) (holding void an agreement to arbitrate in lieu of judicial remedy provided by Securities Exchange Act); cf. *James* v. *Home Construction Co. of Mobile, Inc.*, 689 F. 2d 1357, 1359 (CA11 1982) (implying a right of action for attorneys to seek fees under Truth-in-Lending Act to further congressional policies). This is simply straightforward application of the well-established principle that an agreement which is contrary to public policy is void and unenforceable. See Restatement (Second) of Contracts § 178 (1981); see also, *Brooklyn Savings Bank* v. *O'Neil*, *supra*, at 710; *Crites, Inc.* v. *Prudential Insurance Co.*, 322 U. S. 408, 418 (1944); *Weil* v. *Neary*, 278 U. S. 160, 171–174 (1929); *Woodstock Iron Co.* v. *Richmond & Danville Extension Co.*, 129 U. S. 643, 662–663 (1889).[14]

---

when total expected costs exceed total expected benefits); Kraus, 29 Vill. L. Rev., at 637 ("No matter how sophisticated the analysis of attorney responses becomes, the conclusion remains that the more we decrease the reasonable expectation of Fees Act awards, the less likely it is that Fees Act cases will be initiated").

[14] To be sure, prohibiting fee waivers will require federal courts to make a determination they would not have to make if fees could be waived. However, this additional chore will not impose a significant burden. In

## 2

This all seems so obvious that it is puzzling that the Court reaches a different result. The Court's rationale is that, unless fee waivers are permitted, "parties to a significant number of civil rights cases will refuse to settle . . . ." *Ante,* at 736. This is a wholly inadequate justification for the Court's result.

*First,* the effect of prohibiting fee waivers on settlement offers is just not an important concern in the context of the Fees Act. I agree with the Court that encouraging settlements is desirable policy. But it is *judicially* created policy, applicable to litigation of any kind and having no special force in the context of civil rights cases.[15] The *congressional* policy underlying the Fees Act is, as I have argued throughout, to create incentives for lawyers to devote time to civil rights cases by making it economically feasible for them to do so. *Supra,* at 745–753.[16] As explained above, permitting fee

assessing the impact of making statutory fees nonwaivable on the business of the federal courts, it is important not to overlook the context in which the fee determination is made. Unlike in the adversarial context, if the parties have agreed to a fee (or a range of acceptable fees) as part of a settlement, the court will not be required to hear testimony or engage in judicial factfinding in order to resolve disputes over hours reasonably spent, hourly rates, and the like. Similarly, the court will not have to decide whether to enhance the lodestar to reflect high-quality representation or risk of nonsuccess, or to prepare an opinion in anticipation of appellate review. The court's simple task will be to review the parties' raw billing data in order to determine whether the court itself *could* reasonably have made a fee award of the amount agreed to by the parties. Such calculations will, in the vast majority of cases, require little time or effort.

[15] By lessening docket congestion, settlements make it possible for the judicial system to operate more efficiently and more fairly while affording plaintiffs an opportunity to obtain relief at an earlier time. These benefits accrue when settlements are reached in noncivil rights cases no less than in civil rights cases.

[16] Settlement is discussed only once in the legislative history of the Fees Act. The House Committee Report explained: "The phrase 'prevailing party' is not intended to be limited to the victor only after entry of a final judgment following a full trial on the merits. It would also include a liti-

waivers significantly undercuts this policy. Thus, even if prohibiting fee waivers does discourage some settlements, a *judicial* policy favoring settlement cannot possibly take precedence over this express *congressional* policy. We must implement Congress' agenda, not our own.

In an attempt to justify its decision to elevate settlement concerns, the Court argues that settlement "provides benefits for civil rights plaintiffs as well as defendants and is consistent with the purposes of the Fees Act" because " '[s]ome plaintiffs will receive compensation in settlement where, on trial, they might not have recovered, or would have recovered less than what was offered.' " *Ante,* at 732–733 (quoting *Marek* v. *Chesny,* 473 U. S. 1, 10 (1985)); see also *ante,* at 731 (legislative history does not show that Congress intended to bar "even [waivers] insisted upon by a civil rights plaintiff in exchange for some other relief to which he is indisputably not entitled . . .") (footnote omitted).

As previously noted, by framing the purpose of the Fees Act in very general terms, the Court merely obscures the proper focus of discussion. The Fees Act was designed to help civil rights plaintiffs in a particular way—by ensuring that there will be lawyers willing to represent them. The fact that fee waivers may produce some settlement offers that are beneficial to a few individual plaintiffs is hardly "consistent with the purposes of the Fees Act," *ante,* at 733, if permitting fee waivers fundamentally undermines what Congress sought to achieve. Each individual plaintiff who waives his right to statutory fees in order to obtain additional relief for himself makes it that much more difficult for the next victim of a civil rights violation to find a lawyer willing or able to bring *his* case. As obtaining legal assistance becomes more difficult, the "benefit" the Court so magnani-

---

gant who succeeds even if the case is concluded prior to a full evidentiary hearing before a judge or jury. . . . A 'prevailing' party should not be penalized for seeking an out-of-court settlement, thus helping to lessen docket congestion." H. R. Rep. 7.

mously preserves for civil rights plaintiffs becomes available to fewer and fewer individuals, exactly the opposite result from that intended by Congress.

Moreover, I find particularly unpersuasive the Court's apparent belief that Congress enacted the Fees Act to help plaintiffs coerce relief to which they are "indisputably not entitled." See *ante*, at 731, 732. It may be that, in particular cases, some defendants' fears of incurring liability for plaintiff's attorney's fees will give plaintiffs leverage to coerce relief they do not deserve. If so, this is an unfortunate cost of a statute intended to ensure that plaintiffs can obtain the relief to which they *are* entitled. And it certainly is not a result we must preserve at the expense of the central purpose of the Fees Act.

*Second*, even assuming that settlement practices are relevant, the Court greatly exaggerates the effect that prohibiting fee waivers will have on defendants' willingness to make settlement offers. This is largely due to the Court's failure to distinguish the fee waiver issue from the issue of simultaneous negotiation of fees and merits claims. *Supra*, at 754. The Court's discussion mixes concerns over a defendant's reluctance to settle because total liability remains uncertain with reluctance to settle because the cost of settling is too high. See *ante*, at 734–737. However, it is a prohibition on simultaneous negotiation, not a prohibition on fee waivers, that makes it difficult for the defendant to ascertain his total liability at the time he agrees to settle the merits. Thus, while prohibiting fee waivers may deter settlement offers simply because requiring the defendant to pay a "reasonable attorney's fee" increases the total cost of settlment, this is a separate issue altogether, and the Court's numerous arguments about why defendants will not settle unless they can determine their total liability at the time of settlement, *ante*, at 734, 735, 736, are simply beside the point.[17] With respect

[17] For the reasons stated in Part III–C, I would permit simultaneous negotiation of fees and merits. The parties could agree upon a reasonable

to a prohibition on fee waivers (and again merely assuming that effects on settlement are relevant), the sole question to be asked is whether the increased cost of settlement packages will prevent enough settlement offers to be a dispositive factor in this case.

The Court asserts, without factual support,[18] that requiring defendants to pay statutory fee awards will prevent a "significant number" of settlements. *Ante,* at 734–735. It is, of course, ironic that the same absence of "documentation" which makes comment on the effects of *permitting* fee waivers "premature at this juncture," *ante,* at 742, n. 34, does not similarly affect the Court's willingness to speculate about what to expect if fee waivers are *prohibited.* Be that as it may, I believe that the Court overstates the extent to which prohibiting fee waivers will deter defendants from making settlement offers. Because the parties can negotiate a fee (or a range of fees) that is not unduly high and condition their settlement on the court's approval of this fee, the magnitude

fee which would be subject to judicial approval under the Fees Act. Any settlement on the merits could be made contingent upon such approval. By permitting defendants to ascertain their total liability prior to settling, this approach fully alleviates the Court's concerns in this regard.

[18] The Court does cite a few cases in which courts awarded attorney's fees greater in value than the relief obtained on the merits. See *ante,* at 734–735, and nn. 24, 25. From these, the Court would have us draw the inference that without fee waivers there will be significantly fewer settlements. But what a few courts have done in the context of adversarial proceedings tells us little about what to expect when parties negotiate a reasonable fee award. A court may exercise its discretion and fix a fee award at the upper end of the range of reasonable fees while the parties may agree in negotiation to a figure in the middle or at the lower end of this range.

The Court also cites a brief filed by petitioners in the District Court which states that petitioners viewed the risk of a large attorney's fee award as "'the most significant liability in the case.'" *Ante,* at 735 (quoting Brief for Defendants in Support of Approval of Compromise in *Jeff D.* v. *Evans,* No. 80–4091 (Idaho), p. 5). This self-serving statement, filed by petitioners to persuade the District Court to approve a fee waiver, is hardly authority for the conclusion the Court seeks to establish.

of a defendant's liability for fees in the settlement context need be neither uncertain nor particularly great.[19]   Against this, the defendant must weigh the risk of a nonnegotiated fee to be fixed by the court after a trial; as the Court reminds us, fee awards in *this* context may be very uncertain and, potentially, of very great magnitude.   See *ante*, at 734–735, nn. 23, 24.   Thus, powerful incentives remain for defendants to seek settlement.   Moreover, the Court's decision last Term in *Marek v. Chesny*, 473 U. S. 1 (1985), provides an additional incentive for defendants to make settlement offers, namely, the opportunity to limit liability for attorney's fees if the plaintiff refuses the offer and proceeds to trial.

All of which is not to deny that prohibiting fee waivers will deter some settlements; any increase in the costs of settling will have this effect.   However, by exaggerating the size and the importance of fee awards, and by ignoring the options available to the parties in settlement negotiations, the Court makes predictions that are inflated.   An actual disincentive to settling exists only where three things are true: (1) the defendant feels he is likely to win if he goes to trial, in which case the plaintiff will recover no fees; (2) the plaintiff will agree to relief on the merits that is less costly to the defendant than litigating the case; and (3) adding the cost of a negotiated attorney's fee makes it less costly for the defendant to litigate.   I believe that this describes a very small class of cases—although, like the Court, I cannot "document" the assertion.

## C

I would, on the other hand, permit simultaneous negotiation of fees and merits claims, since this would not contra-

---

[19] Indeed, although such cases should be rare, in frivolous or minor disputes an agreement that no fees be awarded could be approved by the court as "reasonable" under the Fees Act.   Cf. S. Rep. 5 (prevailing plaintiff should ordinarily recover fees, but fees may be denied in "special circumstances"); *Kerr v. Quinn*, 692 F. 2d 875 (CA2 1982); *Skehan v. Board of Trustees of Bloomsburg State College*, 436 F. Supp. 657 (MD Pa. 1977).

vene the purposes of the Fees Act. Congress determined that awarding prevailing parties a "reasonable" fee would create necessary—and sufficient—incentives for attorneys to work on civil rights cases. Prohibiting plaintiffs from waiving statutory fees ensures that lawyers will receive this "reasonable" statutory fee. Thus, if fee waivers are prohibited, permitting simultaneous fees and merits negotiations will not interfere with the Act; the lawyer will still be entitled to and will still receive a reasonable attorney's fee. Indeed, permitting simultaneous negotiations in such circumstances may even enhance the effectiveness of the Fees Act by making it easier for a lawyer to dispose of his cases more quickly. This frees up the lawyer's time to take other cases and may enhance his reputation as an effective advocate who quickly obtains relief for clients.

## IV

Although today's decision will undoubtedly impair the effectiveness of the private enforcement scheme Congress established for civil rights legislation, I do not believe that it will bring about the total disappearance of "private attorneys general." It is to be hoped that Congress will repair this Court's mistake. In the meantime, other avenues of relief are available. The Court's decision in no way limits the power of state and local bar associations to regulate the ethical conduct of lawyers. Indeed, several Bar Associations have already declared it unethical for defense counsel to seek fee waivers. See Committee on Professional Ethics of the Association of the Bar of the City of New York, Op. No. 82–80 (1985); District of Columbia Legal Ethics Committee, Op. No. 147, *supra* n. 8, 113 Daily Washington Law Reporter, at 389. Such efforts are to be commended and, it is to be hoped, will be followed by other state and local organizations concerned with respecting the intent of Congress and with protecting civil rights.

In addition, it may be that civil rights attorneys can obtain agreements from their clients not to waive attorney's fees.[20] Such agreements simply replicate the private market for legal services (in which attorneys are not ordinarily required to contribute to their client's recovery[21]), and thus will enable civil rights practitioners to make it economically feasible—as Congress hoped—to expend time and effort litigating civil rights claims.

During the floor debates over passage of the Fees Act, Senator Hugh Scott reminded the Congress in terms that might well have been addressed to the Court today that "we must bear in mind at all times that rights that cannot be enforced through the legal process are valueless; such a situation breeds cynicism about the basic fairness of our judicial system. [We] must be vigilant to insure that our legal rights are not hollow ones." 122 Cong. Rec. 31471 (1976).

---

[20] Since Congress has not sought to regulate ethical concerns either in the Fees Act or elsewhere, the legality of such arguments is purely a matter of local law. See *Nix* v. *Whiteside, ante,* at 176 (BRENNAN, J., concurring in judgment).

[21] One of the more peculiar aspects of the Court's interpretation of the Fees Act is that it permits defendants to require plaintiff's counsel to contribute his compensation to satisfying the plaintiff's claims. In ordinary civil litigation, no defendant would make—or sell to his adversary—a settlement offer conditioned upon the plaintiff's convincing his attorney to contribute to the plaintiff's recovery. Yet today's decision creates a situation in which plaintiff's attorneys in civil rights cases are required to do just that. Thus, rather than treating civil rights claims no differently than other civil litigation, *ante,* at 733 (quoting *Marek* v. *Chesny,* 473 U. S. 1, 10 (1985)), the Court places such litigation in a quite unique—and unfavorable—category.