Robert CASTRO, Jr., et al., Plaintiffs,

v.

PAINEWEBBER, INC., et al., Defendants.

Nos. 94–CV–65, 94–CV–256.

United States District Court E.D. Texas, Beaumont Division.

Oct. 5, 1994.

Michael A. Havard, Richard Lyle Coffman, Provost & Umphrey, Beaumont, TX, Michael S. Burg, Houston, TX, for plaintiffs Robert Castro, Jr., Raye Castro, Carl Hanks, Daniel Doiron, Lynda Doiron, Robert Falgout, Harlan Harrison, Peggy Harrison, Edward Kennedy, Carol Kennedy, John McClelland, Lynda McClelland, William Moorhead, Brenda Moorhead, W.T. Stanford, Tommie Mae Stanford, Roy A. White, Carolyn White, James Wise, Sr., Betty Jane Wise, John T. Campbell, Samuel Nuchia, George Ann Nuc-

hia, Charles W. Tupper, Betty R. Tupper, Cecil Broussard, Winnie Broussard.

Richard Lyle Coffman, Provost & Umphrey, Beaumont, TX, for consolidated plaintiffs Edna C. Mattox, Larry Gene Cochran, Eris Elizabeth Cochran, Thomas J. Barland, Geraldine Y. Barland, Frank A. Johnston, Linda K. Johnston.

J. Hoke Peacock, II, Orgain Bell & Tucker, Beaumont, TX, Mitchell A. Karlan, Gibson Dunn & Crutcher, New York City, for defendants PaineWebber Inc., PaineWebber Group Inc., Regional S&L Investors Inc.

J. Hoke Peacock, II, Orgain Bell & Tucker, Beaumont, TX, for consolidated defendants William Buchalter, Scott Winter.

Robert L. O'Donnell, Vandeventer Black Meredith & Martin, Norfolk, VA, for defendants Essex Financial Group Inc., Lawrence N. Smith.

John G. Bissell, Strong Pipkin Nelson & Bissell, Beaumont, TX, James J. Wheaton, Willcox & Savage PC, Norfolk, VA, for defendant Essex Financial Partners, LP.

Robert G. Cohen, Ernst & Young, New York City, Ralph I. Miller, Weil Gotshal & Manges, Dallas, TX, for defendant Ernst & Young.

## MEMORANDUM OPINION AND ORDER

SCHELL, Chief Judge.

This opinion and order addresses an on-the-record objection to a proposal that certain class members receive additional cash compensation. The objection might not be unusual were it to have come from defense counsel; here, however, it is urged by the firm of Provost * Umphrey, *Plaintiffs'* counsel in this matter. For the reasons which follow, it is OVERRULED.

## BACKGROUND

The instant class-action securities litigation owes its existence to the ill-fated Essex Financial Partners, L.P. ("Essex"). Although, as shall be explained later, the majority of argument in this case has involved the merits of the settlement of the action instead of the merits of the action itself, a brief explanation of preceding events may be helpful.

### a. High Hopes

Defendant PaineWebber began offering Limited Partnership Units ("LPUs") in Essex to the public in August of 1989. The price was $20/LPU.[1] Essex hoped to cash in on then-recent developments in the banking industry by cheaply acquiring a series of banks (beginning with Essex Savings Bank) and then reselling them at a profit five to seven years thereafter.[2] Essex' initial public offering involved the issuance of 2,078,382 LPUs.

Role-plays shown to PaineWebber employees capture the essence of the sales pitch, most notably in one involving "a client with pension money to invest." Essex is touted as "a solid long-term investment, well suited for pensions ... [without] as much volatility as a traditional stock ... [and] it can really add balance and stability to your overall pension portfolio." Trans. of Audiotape at 10.

> [B]efore August 9th, thrifts were required to maintain capital of only 2% of loan assets. So, a Savings & Loan with $100 million in loan assets was required to have just $2 million of its own capital.
> That's how it *was*.
> But, since August 9th, thrifts are *also* required to have capital of 6%.
> That means that the $100 million thrift we just talked about is in a ticklish position. If it wants to stay in business, it has to come up with an additional $4 million in capital.
> That's why Essex Financial Partners can acquire some quality assets at very favorable terms.
> Trans. of Audiotape at 1–2 (emphasis in original).

---

1. Although LPUs are in some respects different from traditional stock shares, for the purposes of this discussion they are functionally equivalent.

2. The transcript of an internal PaineWebber sales videotape explains further:

   On August 9, 1989, President Bush signed legislation that effectively removes the differences between commercial banks and the so-called "thrift institutions," which are commonly referred to as Savings & Loans and Savings Banks.

   One of the most important differences between a commercial bank and a thrift was that each used to have different capital requirements....

### b. Shattered Dreams

Unfortunately, the "stability" Essex provided was more in the nature of ballast. Essex' actual operations began on November 28, 1989. Eight months later, on the first day that Essex LPUs began to be publicly traded on a secondary market,[3] their price dropped to $16.32/LPU—an 18% decline. Essex' all-time high was $16.36;[4] it eventually fell below $10.00,[5] $5.00,[6] and then $2.00.[7] As recently as May 9, 1994—after the filing of this action, but before the announcement of the terms of the proposed settlement—Essex traded at a price of only $0.875/LPU.

Notwithstanding legal allegations or market subtleties, it seems clear that the steady decline in interest rates during the period of Essex' operations—and thus a concomitant refinancing-and-prepayment of mortgages to which Essex had purchased the servicing rights—was a substantial cause of its difficulties. The legal allegations followed.

### c. Angry Investors

The Putative Class' sixty-page Original Complaint was filed on January 31, 1994, exhaustively alleging violations of the Texas Securities Act, Texas Business and Commerce Code, and Texas Deceptive Trade Practices Act, fraud, negligent misrepresentation, breach of fiduciary duty, constructive fraud, breach of the duty of good faith and fair dealing, breach of contract, negligence and/or gross negligence, and controlling person/respondeat superior liability. By March, the complaint had acquired an additional nineteen pages of allegations of Racketeer Influenced and Corrupt Organizations ("RICO") violations and accountants' malpractice.[8] Although no Defendant ever filed a formal Answer, discussions during the Fairness Hearing in this matter indicated that the Defendants intended to generally deny wrongdoing and to attribute Essex' decline to the unpredictable vagaries of the investment world.

### THE SETTLEMENT

A tentative settlement, in which the Defendants did not admit liability, was announced on July 27, 1994, which divided the Class into two Subclasses.

### a. The Two Sub–Classes

Sub–Class 1 ("S–1") consists of all persons who held Essex LPUs as of July 27, 1994. It is a non-opt-out class as to all members, save that it is a mandatory opt-out class as to those persons who had previously filed arbitration claims against the Defendants prior to that date. Sub–Class 2 ("S–2") consists of all persons who had sold Essex LPUs at a loss prior to that date. Parties who wished to opt out of S–2 were required to have done so by September 28, 1994.

### b. The Roll-up Reorganization

Under the terms of the settlement, all of the liabilities of Essex would be assumed by a newly-created corporation ("Newco") in exchange for Newco's receipt of Essex' assets; LPU holders in S–1 are to receive Newco stock—which is intended to be publicly traded as Essex was—in proportion to their ownership of Essex. This process is expected to be completed within a few months.

### c. S–1

The benefit to S–1 derives primarily from PaineWebber's agreement to forgive approximately $20,000,000 owed to it by Essex upon completion of the roll-up reorganization. The return to S–1 members will be two-fold: first, the debt forgiveness will result in an estimated net increase in Newco's book value on a pro forma basis from a deficit of $5,700,-000 to a surplus of $12,000,000.[9]

---

3. The American Stock Exchange (AMEX), Symbol: ESX.

4. On March 26, 1991.

5. On June 11, 1991.

6. On July 1, 1992.

7. On January 5, 1993.

8. Against Defendant Ernst & Young.

9. Indeed, Essex' price had risen to $2.875 by the time the instant objection was lodged on October 5, 1994.

Secondly, it is hoped that the debt forgiveness will allow Newco to conduct its operations without the extraordinary regulatory supervision which had plagued Essex as its financial position deteriorated.

### d. S–2

The benefit to S–2 outlined in the proposed settlement is somewhat less direct. S–2 members who file proper claims with the court will receive from Newco a total amount of $1,000,000 of non-cumulative, redeemable, non-voting Newco preferred stock at a coupon rate of 12.25%.[10] It is hoped that a successful rights offering will be conducted in a few months, after which the stock would be redeemed; in the event the offering is unsuccessful, the stock will automatically convert to cumulative preferred stock at a coupon rate of 11.75%.

Therefore, unless Newco is catastrophically unsuccessful, S–2 members will receive $1,000,000. The court notes, however, that the million dollars will not be paid out of the Defendants' pockets but rather will be generated by diluting the S–1s' equity interest in Newco.

### e. Attorneys' Fees

Finally, in the proposed settlement the Defendants agreed that they would not oppose Class Counsel's request of $1,850,000—

to be paid directly by the Defendants—for attorneys' fees and expenses. Under the terms of the proposed settlement, the issue would be addressed in a separate proceeding; further, it explicitly provided that the court's decision to award less than the $1,850,000 requested would have no effect on the settlement if it had already been approved.

### THE FAIRNESS HEARING

Pursuant to Fed.R.Civ.P. 23(e), this court scheduled a fairness hearing for September 2, 1994. Two objections were timely filed.

### a. The First Day

On September 2, a hearing was held which lasted for approximately six hours. During that time, the court heard arguments in favor of and in objection to the proposed settlement. Throughout the day, the lone objector present at the hearing repeatedly insinuated that the proposed settlement was a result of collusion and did not adequately compensate the Class.[11] The court did not, and does not, agree with that charge.[12]

Nevertheless, at that hearing the court did express its concern with the amount of the proposed Class Counsel payment, and for the first time raised the possibility that some of that award might be diverted to the benefit of one or both of the subclasses.[13]

---

10. This distribution will be made pro rata on the basis of demonstrated trading loss.

11. At the heart of this argument, of course, was the objector's observation that the only cash which was actually taken out of the Defendants' pockets was the $1,850,000 Class Counsel award which they had agreed not to oppose.

12. The court cannot dispute the fact that the loss to the Defendants—disregarding the $1,850,000 fee application—is minimal insofar as Essex' precarious financial position made the "$20,000,-000" (face value) notes worth substantially less than that amount.

Nevertheless, as far as the *benefit to Essex* is considered, the removal of those debts will result in an immediate and dramatic improvement of its financial position; regardless of the notes' market value, it is obvious that their negative influence on Essex' operations has been substantial.

13. Under either the "lodestar" or "percentage" theory, a critical factor in determining the rea-

sonableness of Class Counsel's fee request is the magnitude of the Class' recovery.

Class Counsel presented both oral and affidavit testimony from an expert in the field of economics. The testimony was offered in support both of the fairness of the settlement and the reasonableness of the attorneys' fees application. While the expert did offer his analysis of the settlement's value to the class, he readily admitted that such a determination was necessarily speculative to a degree.

Although this case is the court's first experience with a securities-fraud class action, it has become aware throughout these proceedings that the nature of the settlement in this action is highly atypical.

In the more common situation wherein the payment to the Class is in the form of cash or easily-marketable securities, the value of the settlement to the Class may be calculated quickly and with a relatively high degree of certainty. Here, however, the only "parties" to receive a cash payment under the terms of the settlement

The parties' counsel continued to urge approval.[14]

### b. The Second Day

On September 8, the court announced that it would approve the settlement over the objections that had been lodged and considered, with one significant modification—with the consent of the Defendants, the court ordered that the $1,850,000 in proposed attorneys fees and costs be placed in the court's registry. Class Counsel did not at that time object to the approval of the settlement with the fund-deposit modification.

Class Counsel urged approval of the Application for Attorney's Fees and Expenses which had been filed during the period between the first and second approval hearing dates. Class Counsel requested the entire $1,850,000, of which $300,000 was to satisfy expenses and representative Plaintiffs' awards. The remaining $1,550,000 would be the fee award—at a rate of almost exactly $1,500/hour.[15] Defendants, as promised, did not oppose Class Counsel's request.

After hearing Class Counsel's arguments, the court adjourned, and a hearing was set for October 5, 1994 at which the $1,850,000 in the court's registry would be apportioned.

### THE $1,850,000 QUESTION

Class Counsel's Second Supplemental Application for Attorneys' Fees and Expenses, filed on October 3, foreshadowed the events of the 5th, at which time Class Counsel strenuously argued against a further award to their clients, and that any "bonus" residue

of the allocated $1,850,000 should be given to charity rather than to their clients.

The court will now address Class Counsel's legal argument.

### a. Introduction

In its Second Supplemental Application and at the hearing, Class Counsel argued that—even if the court was of the opinion that the full $1,850,000 should not be awarded to Class Counsel—any "excess" or "bonus" could not be awarded to the Class, but rather would have to be returned to the Defendants. The legal argument is straightforward: because the court's Rule 23 "privilege" to review settlements does not include a power to *impose* settlements, any post-approval action which affects the rights or recoveries of the parties is improper. Three cases are cited.

Two of the cases involve the same fact pattern in different stages of appellate review—*Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), *on remand*, 888 F.2d 617, *superseded*, 899 F.2d 753 (9th Cir.1989).

The *Jeff D.* cases involved a civil-rights class settlement agreement in which Class Counsel agreed to waive their right to a § 1988 fee in return for a more favorable settlement than their clients might otherwise have received. The relevant holding in those two cases is that Approving Judges may not make *post hoc* awards of attorneys' fees after

---

would be Class Counsel and the Representative Plaintiffs.

Furthermore, at the time approval was urged, estimating the settlement's value to either of the Sub–Classes was a very speculative matter. Although Essex' price had nearly tripled since the date that the proposed settlement was announced, the parties urging approval argued that the rise in price of the LPUs would continue if the settlement were approved (thus removing any uncertainty in that regard). Since each one-point rise would mean an extra $2,000,000 in market value to S–1, another post-approval doubling or tripling would have vastly improved the benefit to the class.

Moreover, since the deadline for filing of S–2 proofs of claim had not yet expired, it was difficult to evaluate the fairness of the proposed

settlement in terms of an equitable treatment of the two Sub–Classes with respect to each other—because the $1,000,000 of redeemable Newco stock was to be distributed on a pro rata basis based on Essex trading loss, any individual S–2's on-the-dollar recovery could not be computed until the "pool" of qualified trading losses was finalized.

**14.** As the parties correctly pointed out, undue delay in approving the settlement would delay the roll-up reorganization and therefore increase the likelihood that Essex would be placed under receivership by bank regulators.

**15.** Class Counsel submitted affidavits establishing that 1,023 hours had been spent on the case; at the October 5 hearing they orally represented that the total had since risen to 1,048.

approving settlements in which such fees are expressly prohibited.

This case is easily distinguished. The Defendants have stated on numerous occasions that they fully expected that settlement of the case would result in a cash payment of $1,850,000. The Defendants agreed not to (and indeed did not) object to an award of the full amount to Class Counsel; nor was any attempt made during the October 5th hearing to recoup the money.[16] Unlike the *Jeff D.* defendants—who would have been forced to pay monies that they believed were rightfully theirs as a result of the settlement—the instant Defendants repeatedly admitted that they "didn't have a dog in the hunt" for the $1,850,000.[17]

In the third case, *In re Warner Communications*, 798 F.2d 35 (2d Cir.1986), the prohibited action was a post-approval attempt to compel greater contribution from certain defendants. The case is consistent with *Jeff D.*, holding not only that Defendants can not be compelled to pay more than they had settled for, but further noting that Approving Courts are also powerless to reapportion liability *among* defendants. Again, that holding is hardly on point with these facts, since by the Defendants' admissions they fully expected that the settlement would leave them out-of-pocket in the amount of $1,850,000. No Defendant has been led to believe that it had bought "peace in the valley" only to be assessed a greater contribution at a later date.

While this court does not believe caselaw prohibits the contemplated "bonus" award, it has been similarly unable to find an instance in which such an award was explicitly approved.[18] Nevertheless, some solace may be found from the Fifth Circuit's decision in

*Wilson v. Southwest Airlines*, 880 F.2d 807 (5th Cir.1989).

In that case, a fund had previously been set up by the Defendant to honor certain back-pay claims arising out of a Title VII class action. Some time after the fund was established, and after all timely claims had been lodged and satisfied, a significant balance existed. Unsurprisingly, all three "parties" (the Class, Class Counsel, and the employer) went after the residue. The district court denied all of the requests, and instead awarded the residue to an anti-discrimination charity under the *cy pres* doctrine.

On appeal, the Fifth Circuit agreed with the District Court's finding that none of the three parties had a *legal* right to the money. It disagreed, however, with its finding that the greatest *equitable* right lay with the charity.

The Fifth Circuit reviewed the history of the underlying litigation and concluded that the entire fund mechanism was set up so that neither the employer nor Class Counsel would have the ability to impede payment in hopes of gaining some of the residue. (Indeed, at oral argument, Class Counsel and the employer notified the court of their agreement to split the residue 35–65 between them with nothing going to the class members). The Court of Appeals also found that, at the time the settlement was approved and the fund created, a significant degree of uncertainty existed about the duration and magnitude of the claim/payout process.

The Circuit Court therefore found that the 35–65 split was appropriate, implicitly concluding that the parties had 1) overestimated the claims outstanding, and 2) underestimated the time class counsel would need to

**16.** Pursuant to the modified settlement agreement, the $1,850,000 had been deposited in the registry of the court shortly before the October 5 hearing.

**17.** An important "ideological consideration" advanced by the Supreme Court dissenters was their concern that approving waivers of § 1988 fees would allow Defendants to put Class Counsel in a "Hobson's Choice" wherein they were ethically required to sacrifice their own gain in order to maximize their clients' recovery.

The argument failed; it may be inferred, therefore, that in refusing to prohibit fee-waiving

agreements the Supreme Court has condoned forms of settlement wherein Class Counsel's interests are subordinated to the Class'. *See Jeff D.*, 475 U.S. at 728, 106 S.Ct. at 1538 ("Plainly, [Class Counsel] had no *ethical* obligation to seek a statutory fee award. His ethical duty was to serve his clients loyally and competently.") (emphasis in original).

**18.** This is due in part, no doubt, to the low likelihood that Class Counsel would ordinarily see fit to appeal a "bonus" paid to their own clients.

dedicate to the payout process. According to the Circuit Court, the first miscalculation gave equitable rights to the employer and the second to Class Counsel. The Circuit Court gave nothing to the Class Members because all of their claims—which were compensatory in nature—had been fully paid.

The instant situation is functionally equivalent in many respects to that in *Wilson.* Certain Defendants have agreed to fund a pot; the court has found that another party (here, Class Counsel) has a legal right only to a portion of the pot; [19] and the question at issue is how to distribute the remainder.

On the other hand, the equities here are strikingly different. The uncertainty which motivated creation of the pot in this case was not of the extent of the Defendants' liability, but rather of degree of the Class' benefit from Class Counsel's efforts. More importantly, the uncertainty did not affect the Defendants' ultimate obligations under the settlement.

Finally, the record is clear that the parties continued to urge approval in spite of an unmistakable admonition during the first (September 2) hearing:

> THE COURT: I think a [lodestar] multiplier of 6 is a little high. I am confronted here with a proposal that the court is being asked to decide the fairness of this settlement before I know the real market value of these securities to the claimants....
>
> What I would like to do is have that money placed in the registry of the court. *And I'll hear objections to this if you object to it.* I will decide on whether or not to approve this settlement, and if I decide to approve it, I would like to have the attorneys fees money placed into the registry of the court. The court can then see how the market reacts to the benefit or detriment of these investors.
>
> How kind or unkind is the market going to be in viewing this settlement? I don't know. Nobody knows. I do know, right now, that I can't quantify what the claimants are going to get. They're not getting money, they're getting securities, some of which are marketable, some of which are not; some of which may be redeemed or may not be redeemed. I don't know.
>
> But if I approve this action, and I'm going to set a time next week to tell you whether I approve it, I would like to have those monies placed into the registry of the court. *I can then see how the claimants fare, and then determine whether and how much—well, how much—of that money goes to Plaintiffs' counsel, how much goes to Class One, how much goes to Class Two, through some method of infusing that money into the partnership or the New-Co.* And I'm not an expert on how to do that, but there's got to be a way to do that, so that it would go to the benefit of the claimants in this case, if I decide the attorneys fees are too high.

Trans. of Sept. 2 hearing at 205–207 (emphasis added).

No objection was made until after the court had approved the settlement as modified by the provision for deposit of the $1,850,000 into the court registry.

## CONCLUSION

Class Counsel's objection is OVERRULED. The court hereby awards to class counsel the amount of $655,000 in attorneys' fees and $300,000 for expenses and Representative Plaintiff awards. For the reasons stated in open court on October 5, 1994, the remaining $895,000 plus interest in the registry fund will be distributed on a pro-rata basis (according to the amount of demonstrated loss in investment value) to the members of S-2.

The clerk shall issue a check to Class Counsel in the amount of $955,000 as soon as possible. The remainder of the fund shall be retained by the clerk until further order of the court.

---

**19.** The court has made oral findings on the record that, under the *Johnson* "lodestar" analysis, Class Counsel is entitled only to $955,000 to cover attorneys' fees, Representative Class Members' awards, and expenses.